Argued and submitted June 13, 1980, reversed and remanded February 9,
petitioner's reconsideration denied April 20,
respondent's reconsideration allowed, former opinion
modified (51 Or App 773, 627 P2d 25) April 20,
petitioner's petition for review denied June 16, 1981 (291 Or 117)

## SPRAY,
*Petitioner,*

*v.*

## BOARD OF MEDICAL EXAMINERS,
*Respondent.*

(CA 14039)

624 P2d 125

312-b

Philip H. Lowthian, Portland, argued the cause for petitioner. With him on the brief were Michael J. Morris and Evans, Grebe, Gross, Jensen & Peek, P. C., Portland.

Walter L. Barrie, Solicitor General, Salem, argued the cause for respondent. With him on the brief were James M. Brown, Attorney General, and Melinda L. Bruce, Assistant Attorney General, Salem.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Petitioner, a physician, seeks review of an order of the Oregon State Board of Medical Examiners (Board) revoking his license to practice medicine in Oregon[1] on grounds of "unprofessional or dishonorable conduct." He challenges the Board's order on ten separate grounds, including the claim that the Board's action is invalid because it has not promulgated administrative rules defining "unprofessional or dishonorable conduct" or, alternatively, because the Board's order in this particular case does not set out such standards. We reverse the Board's order.

At the time these revocation proceedings began, petitioner was engaged in the private practice of medicine in Portland. His practice was limited to the treatment of young people with drug problems. He had been involved with the treatment of drug dependent persons for some time. On May 22, 1978, a complaint was filed against the petitioner by the State Board of Medical Examiners. The Board charged him with failing to comply with the standards required of a physician licensed to practice medicine in Oregon by ORS 677.095

> "by failing to take sufficient medical history from [certain patients] and neglecting to perform a physical examination of [those patients] or to make a medical diagnosis of the patient's illness prior to prescribing for [each patient certain] dangerous and potentially addictive drugs."

The charges named 46 individual patients, listed separately the period of treatment of each (ranging from 1972 through 1978), and the specific drugs given. Many of the charges included information on the patient's hospitalization and/or death due to an overdose of the prescribed drugs. The complaint charged that

> "* * * the act of prescribing such dangerous and potentially addicting drugs for his patients without sufficient medical history or adequate physical examination and failing to arrive at a proper medical diagnosis of the patients' illnesses by Charles C. Spray, Jr., M.D. as required by ORS 677.095 constitutes unprofessional or

---

[1] The revocation of petitioner's license was stayed and he was placed on probation. Under the terms of that probation he is entitled to practice medicine subject to certain limitations.

dishonorable conduct under ORS 677.190(1) by willful and consistent utilization of medical treatment which is inappropriate."

Alternatively, it alleged that

"* * * if the medical records of the patients referred to above do not show medical histories or physical examinations which were actually taken or made by licentiate, but not recorded in the patients' medical records, then such grossly inadequate keeping of patient records constitutes unprofessional conduct on the part of the licentiate under ORS 677.190(1)."

In its final order, dated March 20, 1979, the Board defined the terms "medical history," "medical diagnosis," "physical examination" and "medical treatment." It found as fact that Dr. Spray had failed to take adequate medical histories and had not made adequate medical diagnoses or physical examinations of certain of the named patients[2] for whom large quantities of certain dangerous and potentially addictive drugs were prescribed. From this factual premise, the Board issued the following Ultimate Findings of Fact and Conclusions of Law:

"ULTIMATE FINDINGS OF FACT

"1. Dr. Spray did not perform adequate physical examinations on the named patients initially and did not adequately consider their physical status during the periods in which he was prescribing medication for the named patients.

"2. Dr. Spray, although claiming to detoxify the named patients, continued to give addicting and potentially dangerous drugs in high dosages and amounts over long periods of time.

"3. Dr. Spray prescribed addicting and potentially dangerous drugs without making adequate medical diagnoses of the named patients.

"4. Dr. Spray's medical histories of the named patients are either nonexistent or too abbreviated for another physician to be able to assume care of these patients with any certainty regarding the initial problem, the physical or mental status, the medical treatment regimen, the complications, the progress or failure of the patient.

---

[2] The number of patients discussed in the Board's order was reduced to 12; the charges concerning the other patients were dismissed.

"5. Dr. Spray's prescribing of addicting and potentially dangerous drugs is unprofessional and does not meet the standards of care held by medical practicing licentiates of this Board and is detrimental to the patients he purports to help and endangers their lives.

"CONCLUSIONS OF LAW

"1. The Board has legal jurisdiction of this matter pursuant to ORS chapter 677 and chapter 183.

"2. Dr. Spray has failed to comply with the standards and conduct required by ORS 677.095 of a physician licensed to practice medicine by this Board.

"3. The acts of prescribing dangerous and potentially addicting drugs for his patients, without adequate medical histories, physical examinations and medical diagnosis, constitute unprofessional or dishonorable conduct under ORS 677.190(1) by willful and consistent utilization of medical treatment which is inappropriate."

Before we analyze the machine gun attack[3] mounted by the petitioner on the Board's order, it is useful to describe briefly the statutory framework within which the Board was operating in this case.[4]

## STATUTORY SCHEME

In Oregon, the practice of medicine is governed by ORS ch 677. The statutory basis for the suspension or revocation of a physician's license is ORS 677.190, which provides, in pertinent part,

"The board may suspend or revoke a license to practice medicine in this state for any of the following reasons:

"(1) Unprofessional or dishonorable conduct.

"* * * * *

---

[3] This should not be confused with "a 720 degree whiff of grapeshot," *Neuberger v. City of Portland,* 37 Or App 13, 586 P2d 351 (1978), a 'shotgun blast,' *Norvell v. Portland Area LGBC,* 43 Or App 849, 604 P2d 896 (1979) or a "broadside," *Marquam Investment Corporation v. Beers,* 47 Or App 711, 713, n 2, 615 P2d 1064 (1980).

[4] The Supreme Court's opinions in this area of administrative law make it appear, to a somewhat greater degree than may have been suggested by this court in *Sun Ray Dairy v. OLCC,* 16 Or App 63, 517 P2d 289 (1973), and cases which have followed it, that the particular statutory scheme under which an agency operates plays a pivotal role in establishing the scope of the judicial review process. *See, e.g., Marbet v. PGE,* 277 Or 447, 561 P2d 154 (1977); *McPherson v. Employment Division,* 285 Or 541, 545-548, 591 P2d 1381 (1979); *Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980); *semble, Springfield Ed. Assn. v. School District,* 290 Or 217, 621 P2d 547 (1980).

"(19)   Wilfully violating any provision of this chapter or any rule promulgated by the board.

"* * * * *."

ORS 677.188(4) defines "unprofessional or dishonorable conduct:"

"(4)   'Unprofessional or dishonorable conduct' means conduct unbecoming a person licensed to practice medicine, or deterimental to the best interest of the public, and includes:

"(a)   Any conduct or practice contrary to recognized standards of ethics of the medical profession or any conduct or practice which does or might constitute a danger to the health or safety of a patient or the public or any conduct, practice or condition which does or might impair a physician's ability safely and skillfully to practice medicine;

"(b)   Wilful performance of any surgical or medical treatment which is contrary to acceptable medical standards; and

"(c)   Wilful and consistent utilization of medical service or treatment which is or may be considered inappropriate or unnecessary."

One further statutory provision is relevant to our inquiry. ORS 677.095 provides that:

"A physician licensed to practice medicine by the Board of Medical Examiners for the State of Oregon has the duty to use that degree of care, skill and diligence which is used by ordinarily careful physicians in the same or similar circumstances in his or a similar community."

We note that this statute does not purport to be a separate ground for suspension or revocation of a medical license; ORS 677.190, *supra,* lists those grounds.

We turn now to petitioner's contentions.

### "UNPROFESSIONAL CONDUCT"

Relying on *Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980), the petitioner contends that the Board is obligated to formulate administrative rules or standards outlining the contours of "unprofessional or dishonorable conduct" prior to

suspending or revoking a medical license on that basis.[5] The Board contends that such standards can be determined on a case by case basis.

In *Megdal v. Board of Dental Examiners,* the court examined the phrase "unprofessional conduct," as that term is used with respect to the practice of dentistry in ORS 679.140, as a ground for revocation of a dental license. The court majority stated that the statutory standard, "unprofessional conduct," could be intended in one of three ways: First, it might refer to norms of conduct uniformly or widely recognized in a particular profession. This would require a determination on the Board's part as to what those existing standards in fact are. Secondly, the phrase might express the legislature's own licensing standard, although in general terms, and the agency could proceed to "flesh out" the standard by interpretive rulemaking. Lastly, the term might represent an implied legislative direction to the agency to make rules which specifically defined the standard. *Megdal v. Board of Dental Examiners, supra,* 288 Or at 304-305. The court rejected the first two possibilities in the case before it, and concluded that the regulating board was obligated to issue prior rules as standards before finding the behavior under discussion in that case to be "unprofessional conduct." The court reasoned as follows:

> "Rather, we infer from statutes such as those cited above that when a licensing statute contains both a broad standard of 'unprofessional conduct' that is not fully defined in the statute itself and also authority to make rules for the conduct of the regulated occupation, the legislative purpose is to provide for the further specification of the standard by rules, unless a different understanding is shown." *Id.,* at 313-314; *see also, Arnold v. Bd. of Accountancy,* 49 Or App 261, 619 P2d 912 (1980).

In *Megdal,* the statute under scrutiny listed specific practices that constituted unprofessional conduct; the list, however, was not exclusive and the Board of Dental Examiners was free to find other behavior to be "unprofessional." The particular practice before the court in *Megdal*

---

[5] Initially, the petitioner also contended that the phrase "unprofessional or dishonorable conduct" was void for vagueness under the Due Process Clause of the United States Constitution. He abandoned that claim in his reply brief in light of the Supreme Court's decision in *Megdal.*

was not among those practices specifically prohibited. In the present case, as noted, the term "unprofessional or dishonorable conduct" is itself defined: it means, *inter alia,* "wilful and consistent utilization of medical service or treatment which is or may be considered inappropriate or unnecessary." ORS 677.188(4)(c). The question, then, is not whether the statutory phrase, "unprofessional or dishonorable conduct," refers to a broad standard of conduct that must be defined by prior rulemaking, but whether the phrase "wilful and consistent utilization of medical service or treatment which is or may be considered inappropriate or unnecessary," the actual charge herein, must be so defined by prior rulemaking.[6] We conclude that it need not be.

We begin our analysis with a self-evident proposition: What is inappropriate or unnecessary medical treatment will vary from case to case. The individual patient's illness determines what treatment is necessary or appropriate, given that patient's particular physical make-up and medical problems. Only expert testimony elicited on a case by case basis can determine whether the treatment in a particular case was inappropriate and/or unnecessary. We think it follows that the use of expert testimony to determine the standards of treatment that would be adhered to by the members of the medical community in any given case is implicit in the statutory standard before us. It would be impossible to determine by prior rulemaking what is and what is not inappropriate or unnecessary treatment in all possible cases.

In the face of this practical reality, petitioner insists nonetheless that the Board must have promulgated rules establishing what "unprofessional" conduct is or, at the least, defining "wilfull and consistent utilization of medical treatment which is * * * inappropriate." Some support for petitioner's position may be gleaned from *Megdal,* where the court at one point said,

"To view the statute as incorporating external professional standards by reference creates needless difficulties * * *.

---

[6] The Board has general rule-making authority. ORS 677.265(1).

"Nor may a board proceed on the assumption today, if it ever could, that all members of the profession should be expected to show inarticulated understandings about professional manners and mores because they were drawn from a few homogeneous ethnic, religious and social origins. And to view the professional attitude toward the particular conduct as a factual issue for decision in disciplinary proceedings might well lead to contradictory results depending on the evidence put in the record on that issue * * *." *Megdal v. Board of Dental Examiners, supra,* 288 or at 307.

The fault with petitioner's argument lies in its failure to distinguish between inquiries as to the *ethical* standards, on the one hand, and inquiries as to professional medical treatment standards, on the other. *Megdal* was a case of the former type; the present case, one of the latter. The Supreme Court itself recognized the difference when it said in *Megdal,*

"* * * While current standards of scientific knowledge and of safe and effective technique in a profession or craft may be determinable from such [outside] sources, disputed ethical standards often are more an issue of policy and values than of the state of the art * * *." *Id.,* at 308.

■ We conclude that this case, unlike *Megdal,* does not involve "a broad standard of 'unprofessional conduct' that is not fully defined in the statute itself * * *." *Id.,* at 313. Unprofessional and dishonorable conduct *is* defined. That definition, which is before us in part, sets a standard of "unprofessional or dishonorable conduct" that can only be determined on an individual case basis. It is to be determined through the testimony of qualified physicians as to just what is the norm of treatment in the medical community in the particular case and whether the course of treatment actually followed deviates from the norm to the extent that the physician involved may be said to have used "inappropriate or unnecessary treatment." We hold that prior administrative rules are not needed before disciplining a physician for willful and consistent use of inappropriate or unnecessary medical treatment. *See also Springfield Ed. Assn. v. School District,* 290 Or 217, 621 P2d 547 (1980).

■     Petitioner also contends that, even if prior rules are not needed, the Board must make interpretive rules that can only be applied to future cases and not to the case before it. As the above discussion points out, the Board is not making hard and fast rules, although it may do so, in determining what is inappropriate or unnecessary treatment in all cases. It is making a determination peculiar to the case before it. Moreover, ORS 183.355(5) allows an agency to adopt general policy, in the course of a contested case proceeding, applicable to that case and all subsequent like cases.

## ADEQUACY OF FINDINGS

Petitioner next argues that the Board erred in its final order by "failing to rely upon the evidence in making its finding of facts and by finding inadequacies [in the care provided by petitioner] without establishing a base of adequacy which can be applied in this case or any other." He then goes on to attack the Board's order piece by piece. We understand petitioner's claim to be both a claim of lack of substantial evidence to support the Board's findings and a claim that the Board's findings are inadequate. Specifically, petitioner argues that while the terms "medical history," "physical examination" and "medical diagnosis" are defined, what would be "adequate" histories, examinations and diagnoses are not. He also argues that the Board reaches the conclusion that he violated the standards of the medical community in the treatment of certain patients without setting out just what those standards are.

■ ■     We have concluded that the Board can determine on a case by case basis what is inappropriate or unnecessary medical treatment. To do so, it must first ascertain what would have been appropriate or necessary in the particular case. This determination is dependent on the practices of the medical community as established by expert testimony. The Board must set forth this determination in the form of findings of fact as required by ORS 182.470, and these findings must be supported by substantial evidence. *Springfield Ed. Assn. v. School District, supra,* (slip opinion at 6-7); *see also Megdal v. Board of Dental Examiners, supra,* 288 Or at 306. In this case, the Board concluded that the petitioner failed to comply with the

standards and conduct of a physician licensed to practice medicine by the Board by the wilful and consistent utilization of medical treatment which was inappropriate. There is no finding, however, as to what would have been *appropriate* treatment of these patients under these circumstances, and how petitioner's behavior departed from that standard.

■ We have often discussed the necessity of an agency demonstrating in its final order a rational relationship between the facts it finds and the legal conclusion upon which it acts. This is especially true in a case, such as the one before us, in which the adoption of precise predecisional criteria is not feasible. *See McCann v. OLCC,* 27 Or App 487, 556 P2d 973 (1976), *rev den* 277 Or 99 (1977); *Sun Ray Dairy v. OLCC,* 16 Or App 63, 517 P2d 289 (1973); ORS 183.470(2).

■ The Board must set forth in its final order the standards of practice applicable to these particular patients. In so doing, it must first determine what type of physician the petitioner is, explain why that classification applies, define that classification, *(e.g.,* "primary care" doctor), and then outline the standard of treatment adhered to by such doctors in the medical community at large when treating drug dependent persons such as the patients involved in this case. All of these matters were placed in issue by the testimony, and all must be addressed. Once the Board adopts such findings, just what constitutes "inadequate" medical histories, physical examinations and diagnoses will be sufficiently established to permit judicial review.

### UTILIZATION OF ORS 677.095

Petitioner next challenges the Board's utilization of the provisions of ORS 677.095, *supra,* in reaching its decision in this case.

ORS 677.095 is a singular statute. Its language is addressed to standards relating to medical malpractice actions, not license revocations. It is not, either directly or by reference, made a part of ORS 677.188(4) or 677.190(1). In fact, it only appears in ORS ch 677 by decision of the Legislative Counsel; the legislature, in enacting it, did not direct that it be put there.

■ We agree with petitioner that the Board was not entitled to utilize ORS 677.095 in assessing the petitioner's performance in this case. The legislature has not authorized such utilization. The statute does not fit, by analogy, under any of the subsections of ORS 677.190(1). Absent a rule adopting it as an additional standard, the Board was not permitted to use it. *Megdal v. Board of Dental Examiners, supra.* It follows that the Board's Ultimate Finding of Fact No. 5, and its Conclusion of Law No. 2, both of which refer directly or indirectly to ORS 677.095, are erroneous, and the Board's order must be reversed on this ground as well. ORS 677.095 has no bearing on this case, and its terms can not be considered by the Board in disposing of this case on remand.[7]

## CHALLENGE TO ULTIMATE FINDINGS

■ The petitioner next challenges the Board's final order on the ground that the Board's ultimate findings of fact #2 and #5, *supra,* go beyond the scope of the complaint. Petitioner reads the complaint as charging him with failure to do certain things, *i.e.,* to take medical histories prior to prescribing addictive and dangerous drugs. He contends that he is not charged with giving excessive amounts of drugs or inappropriately prescribing drugs. He argues that findings #2 and #5 imply that it is the giving of the drugs themselves which was wrongful. We agree to an extent. The petitioner was not charged with prescribing drugs unnecessarily or inappropriately. The complaint can be fairly read, however, as charging him with failing to take medical histories, perform physical examinations or to make diagnoses which were sufficiently detailed to demonstrate the need for and the appropriateness of the drugs prescribed. This was one of the main criticisms voiced by the experts testifying for the Board.

Finding #2 states that the petitioner continued to give high dosages of addictive and potentially dangerous

---

[7] We hold here only that the Board may not treat a violation of ORS 677.095, *qua* violation, as "wilful and consistent utilization of medical treatment which is * * * inappropriate." As we explain elsewhere in this opinion, the Board's analysis of what is "inappropriate or unnecessary" *under ORS 677.188(4)(c)* may require the use of standards similar to those addressed in ORS 677.095. This does not permit the Board to use ORS 677.095 in place of ORS 677.188(4), however.

drugs over long periods of time while "claiming to detoxify" his patients. The fact that the petitioner prescribed such drugs is a necessary finding in this case. Without it, the alleged inadequacy of his examinations would be irrelevant. However, whether or not he "claimed to be *detoxifying"* his patients is irrelevant to the charges as written. Such a statement smacks of analysis based in part upon ORS 677.190(10)[8]--a subsection of ORS 677.190 under which petitioner was not charged. There should be no consideration of this concern on remand.

Finding #5 is not a finding but a conclusion of law. We read it as stating that the prescribing of drugs under the circumstances of this case, without sufficient medical histories, physical examinations or diagnoses, is unprofessional.[9] Thus, it is within the scope of the charges. However, as we have noted, it is unsupported by the necessary findings relating to the medical community's standards.

Petitioner also contends that the Ultimate Findings of Fact No. 1, *viz.,* that he did not adequately consider the physical status of his patients during the period of treatment, is beyond the scope of the charges in the complaint. The complaint charges the petitioner with failing to perform a physical examination prior to prescribing certain drugs. It is not clear if this means prior to the initial treatment or prior to any prescription or any new prescription. It fairly can be read to include the latter. The Board's finding, however, cannot stand unless the Board finds that the medical community's standard of treatment in this case

---

[8] ORS 677.190(10) provides:

"The Board may suspend or revoke a license to practice medicine in this state for any of the following reasons:

"(1) Making false or misleading statements regarding skill or the efficacy or value of the medicine, treatment or remedy prescribed or administered by the licensee or at the direction of the licensee in the treatment of any disease or other condition of the human body or mind."

[9] We note that the evidence does indicate that the Board was concerned, to a degree, with the prescription of the drugs themselves regardless of the adequacy of the procedures prior to prescription. We note, for example, that the conditions of petitioner's probation relate only to petitioner's ability to prescribe certain drugs and treat addicts rather than ordering him to do certain things before treating patients.

would require a continual assessment of the patient's physical status during the course of treatment, and the Board has made no such finding.

■     Lastly, petitioner contends that finding of fact #21 is irrelevant. We agree. That finding refers to other treatment for drug dependency received by one of the petitioner's patients during the same time he was being treated by the petitioner. Such a finding is irrelevant to the adequacy of petitioner's treatment and should play no role in the Board's consideration on remand.

### EVIDENTIARY CONSIDERATIONS

■     Turning to the evidence in this case and petitioner's claims concerning it, we conclude that the findings which the Board did make are adequately supported by the record. Petitioner is correct in stating that the expert witnesses disagree in their evaluation of the adequacy or appropriateness of his treatment. However, our review is limited to whether or not the order is supported by substantial evidence in the record as a whole. ORS 183.482(8)(c). Those findings which the Board did make are supported by such evidence. We do not necessarily assume, however, that there is sufficient evidence to support the findings which are lacking, *viz.,* findings related to the standard of treatment adhered to by the medical community in cases such as the one before us.

The Board's order revoking petitioner's license must be reversed and remanded, and the case further considered in light of this opinion. Because the case is to remanded, it is necessary for us to reach such of petitioner's other assignments of error as are relevant to the proceedings on remand. For the most part, these assignments are concerned with procedural and evidentiary issues. We discuss each in turn.

### MOTION *IN LIMINE*

Petitioner contends that it was error not to grant his motion *in limine* to exclude testimony of allegedly unprofessional conduct on his part prior to September, 1975. In support of this contention, petitioner argues that the definition of "unprofessional and dishonorable conduct" contained in ORS 677.188(4)(c) and the standard of conduct

set out in ORS 677.095 did not become law until 1975, while the practices complained of herein took place, in part, before that date.

The Board argues that, even if the legislature did not intend for these statutes to be applied retroactively, its reception of evidence and its findings concerning that earlier time period are proper because the Board's conclusion in this case is not concerned with the number of patients receiving inappropriate treatment but the fact that petitioner treated any one patient in the manner complained of; thus, it argues, those findings and evidence relating to practices before 1975 are not necessary to the Board's ultimate conclusion. We disagree.

■ ORS 677.188(4)(c), the standard of behavior applied to petitioner's practices, did not become law until September, 1975.[10] Or Laws, 1975 ch 796. Four of the Board's findings relate to patients whose treatment began before that date. In one case the patient's treatment was completed prior to that date. The complaint charges the petitioner with failing to take adequate medical histories, to make adequate medical diagnoses and to perform adequate physical examinations *prior* to prescribing certain drugs. Unless the evidence shows that, according to the norms of the medical community, these things must be done prior to each new drug prescription and that, in fact, new prescriptions were issued for the patients in question after September, 1975, these findings are irrelevant.[11] In any event, the finding relating to the patient whose treatment was completed prior to that date must be stricken from the order, and no consideration given to the testimony supporting it. To hold otherwise would amount to a retroactive application of ORS 677.188(4)(c) where there is no indication that the legislature intended such an application and where the statute imposes new obligations or additional duties on past transactions. *See Derenco v. Benj. Franklin Fed. Sav. & Loan,* 281 Or 533, 539, n 7, 577 P2d 477 (1978); *US cert den* 439 US 1051 (1979); *Joseph v. Lowery,* 261 Or 545, 547, 495 P2d 273 (1972).

---

[10] Any argument as to the retroactivity of ORS 677.095 is irrelevant because, as we have pointed out, that section is not relevant to this case.

[11] These findings are related to those discussed previously concerning petitioner's failure adequately to consider the physical status of his patients during the period of treatment.

## LACHES

██ ██ The next contention we examine is petitioner's argument that the Board erred in not granting his motion to dismiss the proceedings because of the passage of time. That motion was based on laches, the statute of limitations, the inability of petitioner to marshal evidence and witnesses, estoppel, and fairness in equity. In support of this contention, petitioner argues that the Board and its staff had full knowledge of his practices since 1965 and that, despite repeated contacts, they took no action against him and failed to warn him of deficiencies in his method of treatment. He points out that, prior to 1967, there was a three year statute of limitation on disciplinary actions such as this one and argues that that statute should be applied by analogy. He also relies on the fact that the standards the Board now invokes did not exist until 1975. Petitioner fails to support these arguments in any detail. We note that there is no statutory requirement that a proceeding to revoke a medical license be brought within a certain amount of time. *See* ORS 677.010 to 677.090. Moreover, petitioner fails to detail the harm he claims to have suffered as a result of the delay in initiating these proceedings. The proceedings are based on a continuing course of conduct, "the consistent utilization of medical treatment which is inappropriate," allegedly continuing up to the present time. The motion to dismiss was properly denied.

## PROCEDURAL CLAIMS

██ We turn now to three assignments of error related to the conduct of the proceedings. The petitioner first claims that it was error for the Board to deny his motion for a public hearing. We agree. Under the Public Meetings Law, all meetings of the governing body of a public body (the definiton of which includes the Board herein) shall be opened to the public subject to certain exceptions. ORS 192.630, 192.610(4).[12] None of those exceptions apply to the

---

[12] ORS 192.630 provides:

"(1) All meetings of the governing body of a public body shall be open to the public and all persons shall be permitted to attend any meeting except as otherwise provided by ORS 192.610 to 192.690."

ORS 192.610(4) provides:

"(4) 'Public body' means the state, any regional council, county, city or district, or any municipal or public corporation, or any board, department,

case before us. ORS 192.660.[13] The Board argues that ORS 677.425(1) allows the Board to hold a closed hearing. That statute provides that:

"(1) Any information provided to the board pursuant to ORS 677.200, 677.205 or 677.410 to 677.425 is confidential and shall not be subject to public disclosure, nor shall it be admissible as evidence in any judicial proceeding."

As this court stated in *Stalder v. Bd. of Medical Examiners,* 37 Or App 853, 862, 588 P2d 659 (1978),

"That provision cannot reasonably be read to apply to adminstrative proceedings brought by the Board against the person who was the subject of the investigation * * *."

Whatever protection is needed for the Board's investigative sources and the identity of patients can be provided for in the course of the public hearing. While it was error for the Board not to hold a public hearing, the petitioner fails to demonstrate how the "fairness of the proceedings or the correctness of the action" was affected by this failure to follow prescribed procedure. ORS 183.482(7). Thus, were this the only error involved in this case, we would decline to order a new hearing.

A related claim is petitioner's contention that the Board erred in holding its two most crucial meetings, the decision to charge and the formulation of the final order, by telephone conference call. As petitioner notes, ORS 677.240(3) provides that:

---

commission, council, bureau, committee or subcommittee or advisory group or any other agency thereof."

[13] ORS 192.660(1)(b) provides:

"(1) Nothing contained in ORS 192.610 to 192.690 shall be construed to prevent the governing body of a public body from holding executive session during a regular, special or emergency meeting, after the presiding officer has identified the authorization under ORS 192.610 to 192.690 for the holding of such executive session. Executive session may be held:

"* * * * *

"(b) To consider the dismissal or discipling of, or to hear complaints or charges brought against, a public officer, employe, staff member or individual agent, unless such public officer, employe, staff member or individual agent requests an open hearing."

"(3) The board shall hold meetings at Portland, Oregon, at such times and places as shall be determined by the board."

The Board argues that the meetings in question were special meetings and subject to ORS 677.240(4), which provides that:

"(4) The chairman, vice-chairman or secretary-treasurer may call a special meeting of the board upon at least 10 days' notice in writing to each member, to be held at any place designated by such officer."

The petitioner does not deny that the meetings in question were special. Assuming that the Board should have held face to face meetings in Portland on both occasions in dispute, the petitioner once again fails to demonstrate how this error in procedure has caused him harm. On remand, the Board is required to meet in Portland, unless it is affirmatively shown on the record that a special meeting has been called.

Petitioner's next contention is that the Board erred in excluding the petitioner and his attorney from the meeting at which it considered the transcript of the testimony in this case. The hearing in this case was conducted by a hearings officer. The Board then considered the evidence and testimony introduced at that hearing. ORS 677.200(3) provides:

"(3) The hearing may be before the board or may be before three or more members or a qualified hearing officer designated by the chairman of the board to take testimony and conduct the hearing. If the hearing is before one or more members of the board or a hearing officer designated by the chairman, a transcript of the testimony taken, together with any exhibits produced, shall be furnished to the board. The accused and his attorney may be present at the meeting at which the transcript is considered by the board and may be given an opportunity to argue and sum up the accused's position before the board."

In *Stalder v. Bd. of Medical Examiners, supra,* 37 Or App at 863, we stated that

"Giving the word 'may' its usual and literal meaning, that section [679.200(3)] prohibited the Board from excluding petitioner and his attorney from the meeting and allowed the Board, in its discretion, to permit petitioner or his attorney to make a presentation."

In this case, the petitioner's attorney specifically asked that he be allowed to be present at the Board meeting. The Board allowed him to appear and argue his case, but did not allow him to remain in the hearing room thereafter. He was asked to remain outside in case the Board had any problems. Petitioner suggests that, if he had been present, the Board's final order would not be so fraught with difficulties. Plaintiff's attorney should have been allowed to remain. However, as the Board points out, the petitioner was allowed to argue his case before the Board and demonstrates no prejudice because he was not allowed to be present throughout the entire proceedings. On remand, the Board should hold its meetings in accordance with statute.

## DISCOVERY AND RELATED EVIDENTIARY CLAIMS

We turn now to petitioner's discovery and related evidentiary claims. Petitioner sets out some twenty claims, many of which are related to the same issues. He first contends that the Board erred in not allowing him access to its investigative and other files relating to him and his practice. The Board has maintained a file on the petitioner since 1965. In *Gregg v. Racing Commission,* 38 Or App 19, 26, 588 P2d 1290 (1979), *rev den* 286 Or 637 (1979), this court stated:

"The question remains whether petitioner has a right to examine the reports as part of the preliminary investigation leading to his contested case hearing. The applicable principle of law is that a party to a contested case hearing has the right to be generally informed of the case against him. But this principle is not without limits. As stated in Cooper, Administrative Law, Vol 2, ch 10, § 2(C) at 363 (1965):

'[A party] does not have a right to delve and pry into all the records of the agency, or to examine secret reports of the agency's investigators * * *.'

"The reports were no part of the state's case and petitioner makes no claim that they were needed as part of his case. Hence, petitioner has shown no ground of entitlement to the reports."

This statement is equally applicable to the case before us. The reports petitioner sought were not part of the case

against him and he failed to demonstrate a need for them.[14] His request was properly denied.[15]

Petitioner also sought to discover a list of the prosecution's witnesses and copies of all the documentary evidence the prosecution intended to rely upon. The Administrative Procedures Act in the statutory section relating to the taking of depositions, provides that "an agency may, by rule, prescribe other methods of discovery which may be used in proceedings before the agency." ORS 183.425(2). The Board has adopted the Attorney General's Model Rules of Procedure under the Act as its own rules of procedure. *See* OAR 847-01-005(1). Those rules do not specifically provide for discovery beyond the taking of depositions and the issuance of subpoenas. *See* OAR 137-03-000 and OAR 137-03-080.

However, the Act evinces an intent fully to inform persons of the case before them. *See* ORS 183.413. In *Gregg v. Racing Commission, supra,* we said that "* * * a party to a contested case hearing has the right to be generally informed of the case against him." 38 Or App at 26. Cooper suggest that, while a party does not have the right to examine all of an agency's reports, he should be able to inspect "all the material upon which the agency proposes to rely as establishing facts in the pending case." Cooper, State Administrative Law, ch 10 § 2(C) at 363 (1965). Thus, it may be that the petitioner has a right to discover all the evidence the prosecution intended to rely upon in this case and to receive a list of the prosecutor's witnesses prior to the hearing. However, Petitioner fails to demonstrate any prejudice to his rights or harm to his ability to present his case because of the failure to allow this discovery, and we therefore decline to decide the matter.

■ The petitioner requested that all tape recordings of Board meetings where he was the topic of conversation be played into evidence. Petitioner claims that this is necessary to assist the court on review in resolving questions of

---

[14] If any of the Board's investigative files were introduced as evidence, petitioner was entitled to discover that evidence. He does not indicate if any of the evidence introduced during the course of the proceedings included investigative materials.

[15] As the Board correctly notes, much of this information may be available under the Public Records Law. ORS 192.410 to 192.500.

fairness and prejudice of the Board and to establish the existence of "secret standards" by which he was being judged. ORS 183.450 provides, in pertinent part, that

"irrelevant, immaterial or unduly repetitious evidence shall be excluded * * * [in contested case proceedings]. All other evidence of a type commonly relied upon by reasonably prudent persons in conduct of their serious affairs shall be admissible."

The charge against the petitioner relates to the adequacy of the treatment afforded his patients. As we have indicated, the standard of conduct by which he is to be judged is that of the medical community at large. The Board's order must reflect that standard, or it is invalid. Absent some showing by petitioner that the Board is fundamentally prejudiced against petitioner, Board discussions of him are irrelevant. No such preliminary showing was made here.

■    Petitioner requested subpoenas duces tecum for two private attorneys who were involved in private lawsuits against him and who, according to petitioner, had been given copies of the Board's original complaint in this proceeding. Subpoenas in contested cases are allowed upon request after a "showing of general relevance and reasonable scope of the evidence sought." ORS 183.440(1). Petitioner failed to demonstrate the relevance of any testimony these attorneys might offer concerning the issues raised in this proceeding. Denial of these subpoenas was not error.

■    Petitioner requested the issuance of a subpoena for Dr. William Brady, the State Medical Examiner. Brady in fact testified at the hearing. Petitioner also requested a subpoena for John Ulwelling, the Board's Executive Secretary, requesting that he be ordered to bring all the files in his possession and available to him in the Board's office relating to the petitioner. As we have stated, the petitioner is not entitled to this information. At the hearing, petitioner claimed that he sought his testimony in regard to the Oregon Medical Association's Resolution No. 9 and the problem the Board perceived concerning inappropriate prescription writing. Resolution 9 relates to the Association's concern with inappropriate prescription writing, the extent of the drug abuse problem and the need to support the Board's study conference on that matter. Again, we fail to see the relevance of this testimony.

Petitioner also sought process for any official of the agency in order to question them on whether or not the agency's initial complaint was an intentional overcharging designed to induce compromise. Again, the testimony would have been irrelevant, and the request was in the nature of a fishing expedition.

■ During the course of the proceedings, petitioner requested that a recess be granted in order that he might take the deposition of Dr. Larsen, a witness for the prosecution. Petitioner claims to have discovered new information during the course of the proceeding related to Dr. Larsen's treatment of patients whom Dr. Spray had also treated and who were the subject of the Board proceedings. Some of Dr. Larsen's information was in his office. The hearings officer denied the request for a recess. Such a denial was clearly in his discretion. *See* OAR 137-03-040(5). From the record it was apparent that petitioner could have examined Dr. Larsen during the proceedings. He then could have sought production of any materials on which Dr. Larsen's testimony was based. Thus, we do not find any error in the failure to grant a recess.

Petitioner assigns as error the failure of the hearings officer to allow him to question one McKenzie, the supervisor of the Board's investigative unit, about the delivery of the complaint in this case to two private attorneys involved in private suits against the petitioner and about a television program during which Ulwelling discussed the case against the petitioner. (Petitioner also sought to compel Ulwelling's appearance as a witness on this basis). Neither of these matters is relevant to the issues in these proceedings. ORS 183.450(1).

■ Petitioner next claims it was error not to allow him to question the Board's chief investigator on the rules or standards the Board relies upon in evaluating physicians' record keeping practices. It had been established by the witness that the agency had made a study of certain physicians' medical record keeping habits and the appropriateness of medical histories. We think that the standards the Board relies upon in judging physicians' practices is relevant to the issues in these proceedings. Throughout the

proceedings, the petitioner attempted to elicit such information and was denied it. That was error. However, we fail to discern the harm to petitioner in light of the fact that, as we today hold, the standards upon which he is to be judged are to be determined according to the norms of the medical community established by expert testimony.

■ Lastly, petitioner sought to question the chief investigator on the Board's methods of investigation, specifically on whether or not the Board uses undercover persons. Again, we fail to see the relevance of this testimony.[16]

### OTHER CLAIMS

■ Petitioner's next contention we turn to is his claim that it was error to deny his motion to dismiss paragraph XLVIII of the complaint. That paragraph relates to a patient who allegedly died of an overdose of the medicine prescribed by petitioner. Petitioner sought to have that paragraph dismissed because exculpatory evidence, a 500 pill dispensing Darvon bottle, was found at the death scene. While this evidence may have suggested that the patient in question died from means other than the prescription medicine, the prosecution's failure to produce the evidence was harmless; the fact that such evidence existed was established at trial and there was no finding in the Board's final order as to the fact or cause of the patient's death.

Petitioner's last claim is that the Board erred in denying his motion to dismiss the proceedings because of pre-judgment and selective prosecution. Petitioner claims that the Board decided to prohibit him from treating drug-dependent persons before the hearing. He points out that the Board had been watching his activities for a number of years and had often discussed his practices before the bringing of these charges. We read his challenge as a challenge to the Board's dual role as investigator and adjudicator. In *Gregg v. Racing Commission,* we stated that

"The work of administrative agencies often involves a combination of adjudicative and investigative functions. Whether good or bad, it is simply the way many agencies

---

[16] Petitioner raises other alleged evidentiary errors, but fails to set out any specific ruling by the hearings officer with regard to those claimed errors. Thus, we decline to consider them.

must work if they are to perform their statutory missions. The fact that members of an agency have both investigated and adjudicated a particular controversy simply shows that they have performed their statutory duties. 'Without a showing to the contrary, state administrators are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.' *United States v. Morgan,* 313 US 409, 421 (1941), quoted with approval in *Withrow v. Larkin,* 421 US at 55. Here petitioner had made no showing of actual prejudice or bias by the agency members charged with adjudication and has therefore shown no cause for relief." *Gregg v. Racing Commission, supra,* 38 Or App at 25.

The petitioner fails to show the existence of any actual prejudice or bias by any Board member. The Board is authorized by statute both to investigate physicians who appear to be incompetent or guilty of unprofessional or dishonorable conduct and to adjudicate their competence or standard of conduct. ORS 677.415(1), ORS 677.190. Petitioner's motion was properly denied.

■ Petitioner's claim of selective enforcement is based on newspaper clippings involving accusations of inappropriate drug prescriptions and injections against the team physician for the Portland Trailblazers and the fact that the Board failed to investigate those public charges. Even assuming that the principles of selective enforcement applied in criminal trials apply to this case, this claim must fail also. In *State v. Hodgdon,* 31 Or App 791, 795-796, 571 P2d 557 (1977), *rev den* 282 Or 537 (1978), we stated:

"* * * discriminatory enforcement of criminal statutes may be subject to attack where it can be shown that the enforcement is the result of intentional or purposeful invidious discrimination.

"The key to a claim of constitutionally objectionable enforcement is evidence of deliberate invidious discrimination. The fact that a criminal statute leaves room for the exercise of discretion in its enforcement does not of itself give rise to a violation of equal protection. In exercise of constitutionally permissible prosecutorial discretion, the state may decide not only who to prosecute, but also which of two applicable statutes will be used to prosecute." (Citations omitted.)

There is no proof in this case that the decision to bring a license revocation proceeding against petitioner and not against other physicians who might be engaging in similar practices is the result of "intentional or purposeful invidious discrimination."

## SUMMARY

In summary, we conclude that prior administrative rules are not required before suspending or revoking a license to practice medicine for "wilful and consistent utilization of medical service or treatment which is or may be considered inappropriate or unnecessary." What is inappropriate or unnecessary can properly be established on a case by case basis. The standards to be applied are those which are adhered to by the medical community of which the petitioner is a member. What those standards are and how the petitioner's conduct falls below them must be set out in the Board's final order.

The only remaining question is the scope of the proceedings to be held upon remand. As we have indicated, the Board's order in this case both misapplies the law and lacks necessary factual findings. Some of the Board's assumptions about its statutory authority have been shown to be invalid. Under such circumstances, we think it is appropriate to reopen the hearing to permit both parties to address, by relevant evidence, the issues as they are now framed.

Reversed and remanded for further proceedings consistent with this opinion.