Submitted March 4, civil penalty reversed and remanded; otherwise affirmed
August 3, 2011, petition for review denied March 8, 2012 (351 Or 649)

Ralph Lewis READ, MD,
*Petitioner,*

*v.*

OREGON MEDICAL BOARD,
*Respondent.*

Oregon Medical Board
A144783

260 P3d 771

George W. Kelly filed the briefs for petitioner.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Jamie K. Contreras, Assistant Attorney General, filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

The Oregon Medical Board (board) concluded that petitioner engaged in unprofessional conduct and willfully disobeyed a board order, and, as a consequence, it revoked his license to practice medicine, fined him $10,000, and ordered him to pay the costs of the disciplinary proceedings— $14,599.05. Petitioner seeks judicial review, arguing, first, that the term "unprofessional conduct" is not adequately defined by statute and that, as a result, the board engaged in *ad hoc* adjudication instead of applying precise rules; second, that he did not willfully disobey a board order because the order in question was impossible to obey; and third, that the board abused its discretion in fining him $10,000 plus costs. We remand for reconsideration of the $10,000 fine and otherwise affirm.

The following facts from the order under review are not disputed. Petitioner is a diagnostic radiologist who received his license to practice medicine in Oregon in 1999. The administrative rules of the Oregon Medical Board require that a person who practices medicine in the State of Oregon register with the board every two years and pay a biennial "active status" registration fee. OAR 857-008-0015; OAR 847-008-0040. In November 2007, petitioner filed a registration form requesting renewal of his active status. The form required the applicant to provide information about his or her practice over the preceding several years and disclose any arrests or convictions. Petitioner disclosed that he had been unemployed since 2003 and had ceased the active practice of medicine in his specialty. He also disclosed that he had been arrested in August 2006 and charged with disorderly conduct, but that the charges had been dismissed with prejudice.

Subsequently, petitioner wrote letters to the board to further explain his activity since 2003. Petitioner explained that he became unemployed in 2003 when Woodland Park Hospital closed. He explained that, although he was not currently involved in direct patient care and was not working for a hospital, he was involved in consultation regarding radiology, medicine, and quality control. He also explained that the dismissed disorderly conduct charge had

been precipitated by a citizen's complaint that he had been seen abusing his dog, an accusation that he denied.

In another letter, petitioner further explained his need for licensure:

"I have been doing work that I consider 'practice of medicine.' My 'current' medical license is a prime requirement for consultation, second opinions, and radiology quality control evaluation that I have been involved in. I do not issue reports of individual radiology exams for the patients' charts, but I do review exams and their reports. Current licensure is important to anyone obtaining second opinions, or having medical care evaluated for quality concerns. I choose to not provide DIRECT patient care to individuals for a variety of reasons which include COST, INSURANCE, and scheduling. Also, I encountered rather pervasive age discrimination, which I do not expect you or anyone else to be able to change. That is not your concern, is it? I believe there are many doctors who are doing administrative type work and NOT providing direct patient care. Do you hassle all of them too?"

If a person licensed to practice medicine ceases to practice for a period of 12 or more consecutive months, the board in its discretion may require the person to prove to its satisfaction that the licensee has maintained competence. ORS 677.175(2); OAR 847-008-0040(5). When a physician has been out of practice for a number of years, it is the board's practice to change the status of the license to "inactive."

The board's Administrative Affairs Committee examined petitioner's application and recommended that his license be changed to inactive status, and the board ratified the recommendation. The board placed petitioner's license in inactive status and informed him that, if he wanted to return his license to active status, he would have to undergo an evaluation from either the Center for Personalized Education for Physicians (CPEP) in Colorado, or the Physician Assessment and Clinical Education Program (PACE); that the evaluation should include an assessment of petitioner's medical knowledge and clinical skills; and that it must include a psychiatric evaluation.

Pursuant to the board's procedures, petitioner requested an investigative interview with the board's Investigation Committee in order to challenge the decision. Petitioner received notice of the interview:

"Pursuant to ORS 677.320(5),[1] the current investigative summary as provided by the case investigator follows: You have requested an interview with the Board's Investigation Committee related to your request for a review and reversal of having your license placed in inactive status.

"Additionally, concerns have been raised that you have been unemployed and not practicing medicine since July, 2003, per your most recent license renewal form, and you are seeking an Active license status. The Board also has concerns related to your 2006 arrest by the police that was precipitated by a citizen's report that you were observed abusing your dog.

"Please come to the interview prepared to discuss the concerns listed above. Please bring any documents, including billing records and patient charts, if applicable, regarding the concerns listed above that will aid you in your response to Committee questions during your interview. In addition to questions regarding the concerns listed above, please be prepared to answer questions regarding your education and experience as well as your current practice situation. Also complete the enclosed form listing your last three years of medical education; attach additional pages as necessary and bring the form and any attachments with you to the interview.

"Legally you are advised that under the provisions of ORS 677.190(23) [2008],[2] the Board has authority to discipline a licensee for refusing an invitation for an interview before the Investigation Committee."

The interview occurred on June 5, 2008. Committee members asked petitioner questions about his qualifications to practice

---

[1] ORS 677.320 provides that, "[u]pon the complaint of any citizen of this state, or upon its own initiative, the Oregon Medical Board may investigate any alleged violation of this chapter."

[2] The statute's subsections have since been renumbered, and its current number is ORS 677.190(22).

medicine and the extent to which he has maintained his medical skills. Petitioner's answers were evasive or nonresponsive, and they were also combative. Petitioner explained that he had asked to meet with the board only in order to exhaust his administrative remedies:

> "I need the meeting because I need to exhaust my administrative appeals. I don't expect any of you to act any different from the people who made this decision in the first place. Why would I expect that? You're used to dealing with drunks, drug addicts, with people who are abusing their patients, and I don't expect to get treated better than they get treated, and I'm not going to. But I need to exhaust my administrative appeal, and you need to do whatever you do. But I'm not going to answer questions and have you come up with something that finally justified a decision that's already been made."

Petitioner declined to give the committee members any details of his practice since 2003 because, in his judgment, the committee already had all of the information it needed and also because other similarly situated licensees were not required to do so.

Subsequently, the board informed petitioner that his medical license would remain inactive due to his failure to provide the board with the additional information requested. Petitioner again requested that his license be changed to active status, and also requested administrative review of the board's decision. In response, the board issued an "Order for Evaluation" to petitioner requiring that within 90 days he successfully complete an evaluation by CPEP, including a psychiatric evaluation.[3] The board further advised petitioner

---

[3] ORS 677.420 provides:

"(1) Notwithstanding any other provisions of this chapter, the Oregon Medical Board may at any time direct and order a mental, physical or medical competency examination or any combination thereof, and make such investigation, including the taking of depositions or otherwise in order to fully inform itself with respect to the performance or conduct of a licensee.

"(2) If the board has reasonable cause to believe that any licensee is or may be unable to practice medicine or podiatry with reasonable skill and safety to patients, the board shall cause a competency examination of such licensee for purposes of determining the fitness of the licensee to practice medicine or podiatry with reasonable skill and safety to patients.

"(3) Any licensee by practicing or by filing a registration to practice medicine or podiatry shall be deemed to have given consent to submit to mental or

that his failure to comply with the order would constitute a violation of ORS 677.190(18) (2008)[4] and could result in disciplinary action by the board.

Petitioner sent an e-mail to CPEP, which might best be described as a semi-coherent rant.[5] CPEP did not respond

---

physical examination when so directed by the board and, further, to have waived all objection to the admissibility of information derived from such mental or physical or medical competency examination on the grounds of privileged communication.

"(4) The board may request any medical organization to assist the board in preparing for or conducting any medical competency examination that the board may consider appropriate."

[4] The current number is ORS 677.190(17).

[5] The e-mail that petitioner sent to CPEP read, in part:

"I have been ORDERED by the Oregon Board of Medical Examiners, to schedule 'evaluation' at your facility, although I would prefer NOT to travel to Denver, if that is possible. The Board has not really told me anything about why they want evaluation or WHAT evaluation they want (except that it includes psychiatric evaluation—I assume that is because I have not been very toady to their various machinations which have delayed the renewal of my medical license.) I believe this 'evaluation' is a way to punish me, not really an evaluation. And I am totally certain that there is no way to evaluate anyone and be certain they would be qualified to practice medicine. But it might be a good way to generate a lot of reasons to NOT let someone practice medicine. I assume that is what you do, but would be interested in hearing the weasel words you use to describe it. Since I have no idea how long your evaluation takes, or when it can be done, I would appreciate any information you can give me. Also there qualifications of your evaluators? That might be a great job for me now that I am not licensed to practice medicine, and probably will not be (based on the disingenuous attitude of the various Oregon Medical Board members so far). IF they have mentioned in any communication that I 'refused' to answer questions, I would point out that they almost certainly did not mention that when I asked to read the question, they refused to let me read them. So I did not answer questions that they did not ask me. That is their idea of REFUSAL! And cost. What amount of 'fine' is in order. Or is a sliding scale? Slides up until it is so unreasonable that I will choose to not pay it? The 'problem' I have is that I have been unemployed. Apparently, without any legal reason, the Board is worried because of this. I did offer to help 'out' any employers who are discriminating on basis of age (but the Board was not worried about doctors violating this Federal law, only about the idea that I might be 'unsafe.') and there have been no complaints against me. For obvious reasons, there is nothing to complain about. Maybe they will tell YOU what they are really doing, I would appreciate knowing for myself, as I suspect there IS an agenda, but it is illegal so they can't talk about it? By the way: I noted that you HOME page seems to be 'poorly designed'—despite the ad for the design firm. * * * By 'poorly designed' I mean that * * * the text letters in the main part of the page are TIGHT against the left edge—look at the page and you will see that is simply a matter of adding another ⟨TD⟩ and putting a space or two in it. I am surprised to see a page like that? [I]t suggests that you are not looking at your own website very much, so I thought you might appreciate the help."

to petitioner's email. Petitioner did not undergo an evaluation at CPEP.

The board issued a Complaint and Notice of Proposed Disciplinary Action to petitioner pursuant to ORS 677.205 for violations of the Medical Practice Act, specifically ORS 677.190(1)(a) ("unprofessional or dishonorable conduct"),[6] and ORS 677.190(18) (2008) (willful violation of a board order). The order advised petitioner that he was entitled to a hearing and that

> "[f]ailure to request a hearing or failure to appear at any hearing scheduled by the Board will constitute waiver of the right to a contested case hearing and will result in a default order by the Board, including assessment of such penalty and costs as the Board deems appropriate under ORS 677.205."

Petitioner requested a hearing. He also voluntarily surrendered his medical license to the board.

The hearing was presided over by an administrative law judge (ALJ), who issued a proposed order concluding that petitioner's failure to answer the board's questions at the June 5 hearing amounted to unprofessional or dishonorable conduct; that petitioner's involvement in the alleged dog abuse did not involve unprofessional or dishonorable conduct; and that petitioner did not willfully disobey the board's order to obtain a psychiatric evaluation at CPEP because it would have been impossible for him to do so due to the fact that CPEP did not perform such evaluations. Petitioner filed extensive exceptions to the proposed order. The board itself then reviewed the exceptions and issued a final order in which it made the following findings concerning petitioner's credibility:

---

[6] ORS 677.188(4) defines "unprofessional or dishonorable conduct":

" 'Unprofessional or dishonorable conduct' means conduct unbecoming a person licensed to practice medicine or podiatry, or detrimental to the best interests of the public, and includes:

"(a) Any conduct or practice contrary to recognized standards of ethics of the medical or podiatric profession or any conduct or practice which does or might constitute a danger to the health or safety of a patient or the public or any conduct, practice or condition which does or might impair a physician's or podiatric physician and surgeon's ability safely and skillfully to practice medicine or podiatry[.]"

"[Petitioner] initially testified that he underwent an evaluation by [CPEP], but later admitted that he did not pay money to CPEP for an evaluation, he did not travel to Colorado to meet with anyone from CPEP, he did not go inside the CPEP office or facility, and he did not get an evaluation. A witness false in one part of his testimony may be distrusted in others. *See* ORS 10.095.

"In addition, throughout the hearing, [petitioner] engaged in word repartee, his answers to questions posed were evasive and non-responsive, and he made gratuitous self-serving comments. Accordingly, the ALJ found that the testimony provided by [petitioner] was not credible and that she would not rely upon his testimony when it contradicts evidence presented by the Board. The Board concurs with this credibility finding by the ALJ."

The board agreed with the ALJ that petitioner's refusal to answer questions posed to him by the investigation committee constituted a violation of ORS 677.190(1)(a), prohibiting "unprofessional or dishonorable conduct," and that no such conduct was involved in the alleged dog abuse incident. However, the board disagreed with the ALJ regarding the refusal to obey a board order by failing to undergo an evaluation by CPEP; the board concluded that petitioner had willfully violated ORS 677.190(18) (2008) ("failing to comply with a board request pursuant to ORS 677.320"). The board ordered petitioner's license revoked, imposed a penalty of $10,000, and assessed the costs of the disciplinary proceeding. Petitioner seeks judicial review.

In his first assignment of error, petitioner contests the board's determination that he engaged in "unprofessional or dishonorable conduct." His argument, as we understand it, has three interrelated parts. First, he contends that the terms "unprofessional" and "dishonorable" are so vague that they do not convey any ascertainable meaning to the board's licensees. Second, he contends that, no matter what "unprofessional" or "dishonorable" might mean, the conduct for which he was cited—refusing to answer questions at the Investigative Committee meeting—does not fit the definition because he was "at all times polite [and] consistently demonstrated his willingness to engage the board in a dialog." Third, he argues that, under *Megdal v. Board of Dental*

*Examiners*, 288 Or 293, 315, 605 P2d 273 (1980), when a statute uses a general term such as "unprofessional conduct," an agency cannot impose a sanction on a licensee for such conduct except according to rules that the agency has promulgated.

ORAP 5.45(1) provides, "No matter claimed as error will be considered on appeal unless the claimed error was preserved in the lower court[.]" That rule applies as well to judicial review of agency action. *Thomas Creek Lumber v. Board of Forestry*, 188 Or App 10, 30, 69 P3d 1238 (2003). None of petitioner's claims of error was preserved for review. In the "Preservation of Error" section of his brief, he cites the following statement from the proceedings below as his preservation of this issue:

> "[At the June 5 interview,] [t]here was no follow-up to any of these questions, and never an ORDER to answer any question * * *. At no time was the licensee informed that there would be legal action against him if he did not come up with some other answer than the one he gave."

That statement, he maintains on judicial review,

> "did make plain to the Board that he objected to the revocation of his license, he objected to the Board finding his June 5 behavior to be unprofessional, and he complained of the Board's failure to give him advance notice that his actions on June 5 provided an independent basis for the revocation of his license."

We disagree. To preserve a claim of error for review, petitioner had to provide the tribunal below with "an explanation of [his] objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). Petitioner's cited statement below does not come close to meeting that standard. Nor does the fact that petitioner appeared without an attorney relax the preservation requirement. *State v. Morrow*, 192 Or App 441, 86 P3d 70, *rev den*, 337 Or 282 (2004).

Recognizing the tenuousness of his preservation argument, petitioner argues that the board's error is apparent on the face of the record and therefore subject to our review even if not preserved. ORAP 5.45(1). Again, we disagree. In light of the elaborated definition of "unprofessional" and "dishonorable" conduct in ORS 677.188(4), it is far from plain that the terms are too vague to comprehend. Regarding petitioner's claim that his conduct was not unprofessional or dishonorable because he was at all times polite to the Investigative Committee, there is a contrary finding of fact and it is supported by evidence in superabundance. And regarding his claim that *Megdal* plainly compels reversal, suffice it to say that that case compels an agency to promulgate rules defining delegative terms, and the agency has, in fact, done so. *See* OAR 847-010-0073. The fact that petitioner does not believe that the rules are specific enough is not an argument under *Megdal* but an argument that the rules, like the statute they elaborate, are too vague—an argument that is as unapparent with respect to the rules as it is with respect to the statute. *See McKay v. Board of Medical Examiners*, 100 Or App 685, 689, 788 P2d 476 (1990) ("unprofessional conduct" for physician is fully defined by statute and does not need to be interpreted by rule before being applied in an individual disciplinary proceeding); *Spray v. Bd. of Medical Examiners*, 50 Or App 311, 624 P2d 125, *aff'd as modified*, 51 Or App 773, 627 P2d 25, *rev den*, 291 Or 117 (1981) (statutory definition of "unprofessional and dishonorable conduct" "sets a standard that can only be determined on an individual case basis"). We therefore decline to consider petitioner's first assignment of error.

In his second assignment of error, petitioner challenges the board's conclusion that he violated the order requiring him to have a psychiatric evaluation at CPEP. Compliance was not possible, he maintains, because CPEP is not an organization that conducts psychiatric evaluations, and one cannot willfully fail to comply with an order if compliance is impossible. We reject that argument.

The board's "Order for Evaluation" informed petitioner that he had to "successfully complete a comprehensive evaluation at the Center for Personalized Education for Physicians (CPEP) in Colorado. This evaluation shall include

a psychiatric evaluation." In response, petitioner consulted CPEP's website, which contained the following pertinent information:

> "The Physician Assessment does not address psychiatric or substance abuse issues, ethical or fraudulent behavior, and/or boundary or behavior issues. If the referring agency suspects problems in these areas * * * it is recommended that the physician be evaluated prior to carrying out the Physician Assessment. If the above issues are identified during the course of the Physician Assessment, the Assessment Report will include recommendations for further evaluation through appropriate resources."

He also wrote a belligerent e-mail to CPEP, which the organization did not answer. He never determined whether the organization's website was up to date. He never actually spoke with a person at the organization to determine whether, according to its website, it would assess him and independently determine whether a psychiatric issue was present, in which case it would refer him to an "appropriate resource." He never contacted the board with the information that he had obtained in order to give the board the opportunity to provide an alternative order. In short, even if, in fact, it would have been impossible for petitioner to obtain a psychiatric evaluation by following through on the order to submit himself to a general competence evaluation at CPEP—a fact that the record does not establish with absolute certainty—petitioner nonetheless had an obligation to make a good faith effort to comply with the board's order, and that effort encompassed a duty to report the asserted impossibility of compliance so that the board could take appropriate alternative action. Instead, petitioner visited a website, wrote a belligerent e-mail, and made no further efforts. The board did not err in concluding that petitioner willfully violated a board order.

Finally, petitioner asserts in his third assignment of error that the board exceeded its discretion in assessing costs and a civil penalty of $10,000. The board's authority to discipline licensees derives from ORS 677.205, which provides that, if the board finds a disciplinary violation, it may invoke a variety of methods of discipline, including suspension or

revocation of a petitioner's license and "such other disciplinary action as the board in its discretion finds proper, including the assessment of the costs of the disciplinary proceeding as a civil penalty or assessment of a civil penalty not to exceed $10,000, or both." ORS 677.205(2)(d), (f). We have no difficulty concluding that the board did not abuse its discretion in assessing against petitioner the costs of the disciplinary proceeding necessitated by petitioner's challenge to the board's determination to place his license in inactive status. We affirm that assessment without further discussion. We disagree, however, with the assessment of the civil penalty.

Petitioner points out that, by the time the board initiated its complaint, his license was in inactive status; thus, in his view, it was unnecessary for him to submit to a competency evaluation. Further, by the time of the hearing, petitioner had surrendered his license. He asserts that those factors eliminated any practical reason for the hearing or the assessment of a fine and mitigated his violations. However, ORS 677.175(3) provides that "[t]he surrender, retirement or other forfeiture, expiration or cancellation of a license issued by the board shall not deprive the board of its authority to institute or continue a disciplinary action against the licensee upon any ground provided by law." Petitioner's voluntary surrender of his license did not deprive the board of its authority to continue the disciplinary proceeding and to impose discipline on petitioner for his violations.

That conclusion, however, does not mean that the board's discretion to impose sanctions is unlimited. Our review of the agency's exercise of its discretion is governed by ORS 183.482:

"(7)   [T]he court shall not substitute its judgment for that of the agency as to any issue of fact or agency discretion. * * *

"* * * * *

"[(8)](b)   The court shall remand the order to the agency if it finds the agency's exercise of discretion to be:

"(A)   Outside the range of discretion delegated to the agency by law;

"(B)   Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency; or

"(C)   Otherwise in violation of a constitutional or statutory provision."

Petitioner's argument recognizes that the board's imposition of sanctions is not inconsistent with agency rule or practice, and he does not argue that it is in violation of the constitution or a statute. Like the petitioner's argument in *Labor Ready Northwest, Inc. v. BOLI*, 208 Or App 195, 202, 145 P3d 232 (2006), *rev den*, 342 Or 473 (2007), petitioner's argument here is that the agency's exercise of its discretion in this case was "[o]utside the range of discretion" delegated by statute. In that case, the Bureau of Labor and Industries (BOLI) ruled that the petitioner had violated prevailing wage laws and, as a penalty, debarred the petitioner from public works contracts or subcontracts for one year. *Id.* at 197. In rejecting the petitioner's argument that the penalty was outside the agency's range of discretion, we reasoned,

"Petitioner also argues that BOLI's imposition of a one-year period of debarment is so excessive and disproportionate to the offense committed that it necessarily falls outside the range of BOLI's discretion. To be sure, a one-year debarment is a significant penalty. In fact, we have described debarment as an 'extreme sanction.' However, given the statutory mandate that BOLI 'shall' debar upon making certain findings and the fact that the agency's discretion extends to imposition of a three-year period, *former* ORS 279.361(1), we cannot say that a one-year debarment—only one-third of the maximum potential allowable sanction—is so excessive in the totality of the circumstances as to be outside the range of discretion committed to the agency."

*Id.* at 204 (citation omitted). Here, on the other hand, the board imposed on petitioner the most severe sanction available. The board's options, as noted, were suspension or revocation of petitioner's license and "such other disciplinary action as the board in its discretion finds proper, including the assessment of the costs of the disciplinary proceeding as a civil penalty or assessment of a civil penalty not to exceed $10,000, or both." ORS 677.205(2)(d), (f). Petitioner had already surrendered his license, so that sanction was not

available. Thus, the $10,000 fine in addition to the cost of the disciplinary proceedings—$14,599.05—were the maximum sanction within the board's authority. That sanction was imposed on petitioner because, to put it plainly, he was uncooperative and belligerent. Further, the "unprofessional or dishonorable" conduct for which he was sanctioned did not have any direct relation to public safety or the care of patients. Under the totality of the circumstances, we conclude that the $10,000 fine was disproportional to petitioner's offense. We therefore reverse as to the civil penalty and remand for reconsideration.

Civil penalty reversed and remanded; otherwise affirmed.