Argued and submitted February 4, reversed and remanded December 6, 2000

# John B. COCHRAN, Ph.D.,
*Petitioner,*

*v.*

# BOARD OF PSYCHOLOGIST EXAMINERS,
*Respondent.*

## (CA A105672)

15 P3d 73

J. Michael Alexander argued the cause for petitioner. With him on the brief was Burt, Swanson, Lathen, Alexander & McCann.

Charles L. Best argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

Edmonds, P. J., concurring.

**KISTLER, J.**

The Board of Psychologist Examiners disciplined petitioner for providing expert opinions in connection with two related judicial proceedings. On review, petitioner raises a variety of administrative-law and constitutional challenges to the Board's order. We reverse the Board's order and remand for further proceedings.

The State of Washington convicted Gerald Hanson of shooting a convenience store clerk in Snohomish, Washington. While Hanson's appeal was pending, Hanson sued the City of Snohomish and its police chief, Patrick Murphy, alleging malicious prosecution, false arrest and imprisonment, negligent investigation, defamation, and violation of his civil rights. Murphy asked petitioner, a psychologist licensed in Oregon, to determine whether Hanson's behavior was consistent with the crime and to write a report for Murphy's internal use in preparing his defense to Hanson's civil action. According to Murphy, the report was not intended to be used as evidence in court. Murphy told petitioner that he was free to interview any of the witnesses in the case except Hanson— a limitation that Hanson's attorney had imposed.

Petitioner submitted his report, which he labeled "Psychological Evaluation," to Murphy. In his report, petitioner stated that he is an expert in forensic psychology, that he has "done profiling of dangerous offenders," and that he "ha[s] consulted on many cases regarding serial killers, serial rapists, and other crimes of violence[.]" The report identifies the materials petitioner reviewed and the scope of his investigation.[1] It also describes the facts of the crime, the information learned as a result of the police investigation, materials that were found in Hanson's home, and information that petitioner had received about Hanson's actions immediately before the shooting. A significant portion of the report is devoted to analyzing Hanson's personality based on a manuscript Hanson had written. Based on that information, petitioner stated that he had not found any significant evidence

---

[1] In preparing his report, petitioner reviewed news reports, trial transcripts, and police reports. Petitioner also consulted with investigators who had interviewed witnesses and the victim.

that Hanson was not the person who shot the convenience store clerk and that he had "no doubt that Gerald Hanson was the shooter." The report concludes: "Obviously, the random shooter of [the convenience store clerk] is extremely dangerous and in my professional opinion the evidence points beyond a reasonable doubt to Gerald Hanson."

After petitioner submitted his report to Murphy, the Washington Court of Appeals reversed Hanson's conviction and remanded the case for a new trial. The district attorney subpoenaed petitioner to testify at Hanson's bail hearing on remand. At that hearing, petitioner testified, in response to the district attorney's questions, about his background as a forensic psychologist and his experience in profiling criminal suspects—a discipline that he identified as a subspecialty of forensic psychology. On direct examination, petitioner acknowledged that he had not been able to talk to Hanson. He testified, however, that he was not able to find any significant evidence that indicated that Hanson was not the shooter and that a person capable of committing such random acts of violence can be extremely dangerous.[2] On cross-examination, petitioner agreed that consistency with a psychological profile does not prove guilt in a particular case. When asked if he had some reasonable doubt as to Hanson's guilt, he stated that he did not, but he acknowledged that the question of guilt should be resolved by the jury. Finally, petitioner testified that, if Hanson was the person who committed the crime, he was still dangerous. Following the hearing, Hanson was released on bail and ultimately acquitted.

In 1990, the Board issued a notice of proposed suspension of petitioner's psychologist license, citing petitioner's report and his testimony at the bail hearing. In 1999, the Board issued its final order, ruling that petitioner had violated Principles 1.f, 3.c, 4.g, and 8.c of the Code of Professional Conduct of Psychologists.[3] The code consists of ten

[2] During his testimony, petitioner referred to the report that he had prepared for Murphy, and the district attorney offered the report into evidence.

[3] The Board has authority to "formulate a code of professional conduct for the practice of psychology," ORS 675.110(12), and to discipline psychologists who violate that code, ORS 675.070(1) & (2)(i). Pursuant to ORS 675.110(12), the Board has adopted the American Psychological Association's Ethical Principles of Psychologists and Code of Conduct. *See* OAR 858-10-075 (1982). All references to the

principles, which state general goals for the profession. We discuss the fourth principle for two reasons: It illustrates the structure of the code, and the Board's analysis of it is typical of its analysis of the other three principles that its opinion discusses. The fourth principle states:

> "Public statements, announcements of services, advertising and promotional activities of psychologists serve the purpose of helping the public make informed judgments and choices. Psychologists represent accurately and objectively their professional qualifications, affiliations, and functions, as well as those of the institutions or organizations with which they or their statements may be associated. In public statements providing psychological information or professional opinions or providing information about the availability of psychological products, publications, and services, psychologists base their statements on scientifically acceptable psychological findings and techniques with full recognition of the limits and uncertainties of such evidence."

Each of these ten principles is followed by subsections identifying, somewhat more specifically, how the general principle applies. Principle 4.g, one of the four subsections that the Board found petitioner violated, provides:

> "g. Psychologists present the science of psychology and offer their services, products, and publications fairly and accurately, avoiding misrepresentation through sensationalism, exaggeration, or superficiality. Psychologists are guided by the primary obligation to aid the public in developing informed judgments, opinions, and choices."

Although Principle 4 might appear to be limited to advertising or promotional activity by psychologists, the Board construed it more broadly in this case. It concluded that it also applies to all public statements a psychologist

---

code are to the version in force when the acts that gave rise to the Board's concern occurred. ORS 675.070(2)(d)(A) also authorizes the Board to discipline psychologists who are "guilty of * * * unprofessional conduct," but the Board does not appear to have disciplined petitioner for violating that subsection. Although the notice of proposed suspension cites both ORS 675.070(2)(d) and ORS 675.070(2)(i) as the bases for disciplining petitioner, the Board's order appears to rely solely on ORS 675.070(2)(i), which authorizes discipline for violating "any provision of the code of professional conduct formulated under ORS 675.110(12)."

makes, including testimony in court.[4] Applying Principle 4.g, the Board reasoned:

> "The gravamen of the Board's concern with the Licensee's conduct is that he misrepresented the bounds of the science of psychology by rendering an opinion regarding the guilt of a criminal defendant in a public forum. Furthermore, Licensee rendered an opinion about the defendant's future dangerousness without the benefit of a proper investigation of his background. The Board finds this to be the type of 'superficiality' prohibited by the rule. Not only could those members of the public present at the Bail Hearing have been misled about what psychologists can scientifically establish, [but] the media's reporting of the Licensee's testimony and opinions [also] may have misled the public at large. * * * Licensee knew or should have known he could not determine Gerald Hanson's guilt with psychological assessment. He also should have known that any opinion regarding Gerald Hanson's future dangerousness needed significant qualification given the limited information he had."

Before turning to the specific challenges that petitioner raises on review, we note that the Board based its decision that petitioner had violated Principle 4.g on the fact that petitioner offered his opinion on both Hanson's guilt and his future dangerousness. Similarly, in disciplining petitioner, the Board did not distinguish between petitioner's opinion on Hanson's guilt and his opinion on Hanson's future dangerousness, nor did it distinguish among the various principles that it found petitioner had violated. The Board did not say, for example, that it would have disciplined petitioner solely for offering an opinion on guilt or solely for violating Principle 4.g. Rather, it relied on the cumulative effect of petitioner's testimony, the report, and the four violations it found in deciding to discipline petitioner.

■ On review, petitioner advances a number of reasons why the Board was precluded from disciplining him for expressing his opinions. Petitioner acknowledges that our

---

[1] Petitioner has not challenged the Board's interpretation of Principle 4, although he has argued that it cannot survive an Article I, section 8, challenge. We do not reach that constitutional question because, as explained below, we hold that the Board's opinion lacks substantial reason.

decision in *Loomis v. Board of Psychologist Examiners*, 152 Or App 466, 954 P2d 839 (1998), forecloses some of his arguments but asks us to reconsider that decision. He also argues that the Board's order or rules violate constitutional guarantees of free expression and separation of powers—issues that we did not consider in *Loomis*. We need not decide whether we should reconsider our decision in *Loomis*, nor do we need to decide whether the Board's order and its rules can withstand petitioner's constitutional challenges. We agree with petitioner that the Board's order in this case does not meet the test of substantial reason. *See Drew v. PSRB*, 322 Or 491, 500-01, 909 P2d 1211 (1996); *Spray v. Bd. of Medical Examiners*, 50 Or App 311, 624 P2d 125, *mod on recons* 51 Or App 773, 627 P2d 25, *rev den* 291 Or 117 (1981).

We explained in *Loomis* that the ethical code that the Board adopted can avoid the statutory problem that the court identified in *Megdal v. Board of Dental Examiners*, 288 Or 293, 605 P2d 273 (1980).[5] *See Loomis*, 152 Or App at 472. It does not necessarily follow, however, that no further refinement is necessary before the Board may discipline its licensees for violating those rules. We recognized in *Spray* that the Board of Medical Examiners could look to generally accepted standards of care to define unprofessional conduct on a case-by-case basis. 50 Or App at 318-19. We explained, however, that, if the Board of Medical Examiners chose to proceed in that fashion, it was not sufficient to find that the doctor in that case had failed to perform "adequate physical examinations" or failed to make "adequate medical diagnoses" of his patients before treating them. Rather, we held:

> "The Board must set forth in its final order the standards of practice applicable to these particular patients. In so doing,

[5] The court reasoned in *Megdal* that the legislature intended that the Board of Dental Examiners would adopt rules to define and limit the statutory prohibition against "unprofessional conduct" before seeking to discipline dentists for violating that prohibition. 288 Or at 320. ORS 675.070(2)(i) similarly contemplates that the Board will adopt a code of professional conduct before it disciplines psychologists for violating it. We recognized in *Loomis* that the Board generally has complied with that requirement, 152 Or App at 472, although the question always remains in a particular case whether a specific rule furthers the policy of fair notice implicit in ORS 675.070(2)(i). *See Megdal*, 288 Or at 314 (identifying statutory purpose that rules fulfill).

it must first determine what type of physician the petitioner is, explain why that classification applies, define that classification (*e.g.* 'primary care' doctor), and then outline the standard of treatment adhered to by such doctors in the medical community at large when treating [the same class of persons]. All of these matters were placed in issue by the testimony, and all must be addressed. Once the Board adopts such findings, just what constitutes 'inadequate' medical histories, physical examinations and diagnoses will be sufficiently established to permit judicial review."

50 Or App at 321. Without those findings, the agency's order failed to establish a "rational relationship between the facts it [found] and the legal conclusion upon which it [acted]." *Id.* As we emphasized, "[t]his is especially true in a case, such as the one before us, in which the adoption of precise predecisional criteria is not feasible." *Id.*

The problem that was present in *Spray* is present here. The ethical code the Board adopted sets out ten principles, which consist of little more than statements of general goals.[6] The subsections that follow each principle narrow it somewhat but still leave large gaps for the Board to fill on a case-by-case basis.[7] In this case, the Board attempted to fill those gaps by reasoning that petitioner's testimony about Hanson's "future dangerousness without the benefit of a proper investigation of his background" was "the type of 'superficiality' prohibited by [Principle 4.g]."

The Board's use of the word "proper" begs the question in the same way that the Board of Medical Examiner's use of the word "adequate" did in *Spray*. The Board never identifies the standard that it employed in determining the sort of investigation that is necessary before a psychologist

---

[6] For example, the first principle provides:

"In providing services, psychologists maintain the highest standards of their profession. They accept responsibility for their acts and make every effort to ensure that their services are used appropriately."

[7] For example, Principle 1.f, which the Board found petitioner also violated, provides:

"As practitioners, psychologists know that they bear a heavy social responsibility because their recommendations and professional actions may alter the lives of others. They are alert to personal, social, organizational, financial, or political situations and pressures that might lead to misuse of their influence."

may render an opinion on future dangerousness. Psychologists do not hold a uniform view on that subject. *See State v. Wagner*, 305 Or 115, 153-54, 752 P2d 1136 (1988), *vacated and remanded on other grounds* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989) (recognizing the range of views on whether psychologists are competent to give an opinion on future dangerousness). It is not clear from the Board's opinion, however, whether the Board determined that petitioner's investigation was not "proper" because every reasonable psychologist would have done more, because the majority of psychologists would have done more, or because scientific standards established by some independent body (or recognized within the profession) require more. When the Board seeks to fill the gaps in its ethical rules by finding that a psychologist has not followed "proper" professional standards, it should articulate the standard it employs in determining the limits of professional competence. If, for example, the Board wishes to discipline a licensee for espousing the views of a minority of his or her profession, it should explain why adhering to that minority view means that the licensee has fallen below the professional standard that psychologists should meet.

Not only is the standard that the Board employed in determining what constitutes "a proper investigation of [Hanson's] background" unarticulated, but the Board's opinion does not make the findings that are necessary to support whatever standard it employed in determining that petitioner's testimony misrepresented the bounds of psychology in violation of Principle 4.g. *See Spray*, 50 Or App at 318-19. To the extent that the Board concluded that petitioner's testimony was deficient because he did not qualify it, the Board's reasoning suffers from a similar problem. The Board neither explains the basis for saying that some additional qualification was necessary, nor does it identify how petitioner should have qualified his testimony. In short, the Board's opinion fails to reveal either the evidentiary basis or the rationale for saying that petitioner's testimony fell outside the bounds permitted psychologists. *See id.*[8]

---

[8] The Board argues that *Spray* does not apply here for three reasons. First, it argues that because "*Spray* specifically dealt with a breach of the standard of care for a physician within his community, its holding is inapposite to this case involving unethical conduct." As explained above, however, the Board's ruling that

■■ We note an additional consideration that calls for a more specific explanation. In this case, the Board disciplined petitioner for offering an expert opinion as part of a judicial proceeding. In Washington, as in Oregon, scientific evidence must meet a minimum standard of reliability before it may be admitted into evidence. *See State v. Greene*, 139 Wash 2d 64, 69-70, 984 P2d 1024 (1999), *cert den* ___ US ___ , 120 S Ct 1726, 146 L Ed 2d 647 (2000); *State v. O'Key*, 321 Or 285, 290-91, 899 P2d 663 (1995). If the evidence meets the minimum standard necessary to be admitted in a judicial proceeding or if the opposing party chooses not to object on that ground, a licensing board should explain why an expert should be disciplined for giving testimony that the court permitted. We do not hold that the Board may not discipline its members for testimony that violates its ethical rules. We hold only that, if the Board does so, it needs to make both the premises and the factual bases for its decision clearer than the Board has done here. *See Spray*, 50 Or App at 318-19.

Reversed and remanded.

**EDMONDS, P. J.,** concurring.

I agree with the reasoning and the result of the majority opinion. I write separately to express my concern that the Board of Psychologist Examiners is ignoring a fundamental statutory policy in the application of its administrative authority to petitioner's case. I do not question the authority of the Board to determine what is and what is not ethical conduct for the practice of psychology in this state, and so long as its interpretations of its own rules are plausible, they will be upheld by this court. *See Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994). However, by granting authority to the Board to impose sanctions for ethical violations, the legislature

petitioner violated its ethical rules is based on its conclusion that his testimony fell below some unspecified standard of care that applies to psychologists; *Spray* is on point. Second, the Board argues that we resolved this issue in *Loomis*. The question, however, in *Loomis* was whether findings were required under *Megdal*. *See* 152 Or App at 472. We held that the adoption of the code was sufficient to satisfy, as a general matter, the statutory requirement identified in *Megdal* and also present here. *See* n 5 above. We never addressed the question whether, under *Spray*, additional findings were necessary to fill in the gaps in the code. Finally, the Board argues that its findings are sufficient. For the reasons set out above, we reach a different conclusion.

intends that practitioners be on notice about what conduct the Board's code of ethics requires before sanctions are imposed, and that element appears to be lacking in this case.

The facts of this case illustrate my concern. Petitioner was found to be in violation of ethical code provisions that state general rules of conduct for the profession of psychology regarding statements in a public forum. The code requires accurate and objective reporting. According to the Board, petitioner "misrepresented the bounds of the science of psychology" by the rendering of his opinion. It reasoned,

"[petitioner] knew or should have known he could not determine Gerald Hanson's guilt with psychological assessment. He also should have known that any opinion regarding Gerald Hanson's future dangerousness needed significant qualification given the limited information he had."

However, the language of the code does not prohibit a psychologist from testifying in court and rendering an opinion about the guilt of a criminal defendant or his future dangerousness, and the Board points to nothing in its text or the context that would inform a practitioner that it is unethical conduct to render such opinions in a public forum.[1]

Furthermore, the Board does not point to any well-recognized interpretation of the code that would provide petitioner constructive notice of the standards that it imposes. Finally, the Board does not point to any evidence that petitioner concealed or misrepresented any fact to the court conducting the bail hearing. So far as the record shows, he disclosed the extent of his investigation and the factors on which he based his opinion to the judge presiding over the bail hearing.

ORS 675.110(12) authorizes the Board "[t]o formulate a code of professional conduct for the practice of psychology giving particular consideration to the Ethical Standards of Psychologists, promulgated by American Psychological

---

[1] In essence, it appears that the Board is using a code that establishes aspirational standards as the basis for imposing specific discipline. That is not the original purpose of the code, and the Board needs to act with greater care, and give more thorough explanations, when it converts a profession's aspirations into specific disciplinary requirements.

Association." The statute also gives the Board rule-making authority to carry out its grant of authority, ORS 675.110(15), and the authority to impose sanctions for violations of the provisions of ORS 675.010 to ORS 675.150, its rules, and any code of professional conduct that it has adopted. *See* ORS 675.110(3), ORS 675.110(4) and ORS 675.110(5). When the legislature authorizes a board to exercise control over professional standards by adopting codes or rules, it is deemed to have contemplated a legislative policy that the board provide fair notice of grounds for sanction before imposing a sanction that could lead to the loss of a practitioner's profession or occupation. *Megdal v. Board of Dental Examiners*, 288 Or 293, 311-15, 605 P2d 273 (1980). Although that intention does not require that all circumstances of professional conduct be described by a professional code of conduct, the legislature's intent in the delegation of its authority is manifested in two particulars: (1) The Board must give notice of censurable conduct; and (2) it must confine disciplinary administration to announced standards. *Id.* at 314. Here, it appears that the legislature's intent in that regard has been frustrated. My review of the board's record reveals nothing that would have put petitioner on prior notice that his testimony was unethical, for the reasons articulated by the Board. The majority is correct when it says that on remand the Board must clarify why petitioner's conduct is subject to sanction.

One further issue deserves comment. The Board argues that any requirement imposed on it by the legislature under the reasoning in *Megdal* has been satisfied by the adoption by the Board of the American Psychological Association's "Ethical Principles of Psychologists" (the code) and that we held to that effect in *Loomis v. Board of Psychologist Examiners*, 152 Or App 466, 954 P2d 839 (1998). In *Loomis*, the petitioner was disciplined for making representations and recommendations to a court about an in-court custody dispute because the Board believed that she had not disclosed her bias toward her client and her reservations that would have affected the reliability of her recommendations. We held that the Board, by relying on the code and an expert's testimony regarding the code, was acting within its delegated authority from the legislature and that there was

substantial evidence to support its finding of nondisclosure. Key to our decision was the principle in the code adopted by the Board that psychologists must "strive to ensure that the results of assessments and their interpretations are not misused by others." In *Loomis*, the above standard imposed by the code was readily ascertainable by those regulated. It does not follow that every provision of the code will provide the requisite degree of notice of standards for censurable conduct. Our holding in *Loomis* should not be understood as a wholesale endorsement that the Board, by adopting the code, has complied with the legislature's mandate to provide notice in every case. Also, I believe that ORS 675.110 requires the Board to explain in every case why the person subject to sanction had at least constructive knowledge of the standard of professional conduct that has been alleged to have been violated *before* the alleged violation occurred. Otherwise, the board could be without authority to sanction. It is my hope that the Board will reexamine its position on these issues on remand in fairness to petitioner and to facilitate further review, if any.

Accordingly, I concur with the majority.