Argued and submitted December 11, 2003, reversed and remanded for
reconsideration June 9, 2004

Debra "Kali" MILLER, Ph.D.,
*Petitioner,*

*v.*

BOARD OF PSYCHOLOGIST EXAMINERS,
*Respondent.*

00-05; A119529

91 P3d 786

Charles R. Williamson argued the cause for petitioner. With him on the briefs was Kell, Alterman & Runstein, L.L.P.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, Deits, Chief Judge, and Schuman, Judge.

SCHUMAN, J.

Deits, C. J., concurring.

### SCHUMAN, J.

After a contested case hearing, the Board of Psychologist Examiners (board) issued an order reprimanding petitioner, a licensee, and fining her $1,000 for continuing to provide psychotherapy to two minor children after their recently divorced father demanded that she stop. According to the board, that conduct violated petitioner's ethical duty to conduct therapy only with the informed permission of a person lawfully authorized to provide it. Petitioner seeks judicial review. We reverse.

ORS 675.110(12) authorizes the board to adopt a code of professional conduct for psychologists. Pursuant to that authority, the board promulgated OAR 858-010-0075(1), which, in turn, adopts the 1992 version of the American Psychological Association's "Ethical Principles of Psychologists and Code of Conduct." Rule 4.02(b) of that code provides:

"When persons are legally incapable of giving informed consent, psychologists [must] obtain informed permission from a legally authorized person, if such substitute consent is permitted by law."

According to the board, the following conduct by petitioner violated that rule.

State officials became concerned that two minor children, P and C, had been sexually abused. The officials informed the children's mother and advised her to find the children a psychotherapist. In August 1999, mother met with petitioner, a psychologist specializing in the treatment of children, to discuss the advisability of therapy in light of the stress P and C were already experiencing due to their parents' separation and impending divorce. Mother and petitioner agreed to begin therapy for the children, and mother, the custodial parent, gave her informed permission. The first sessions occurred in September 1999.

On October 7 of that year, mother and father's marriage was dissolved. One section of the dissolution judgment provided:

"**CUSTODY**. Mother and father are awarded joint legal and physical custody of the parties' minor children * * *. By

> joint legal custody, the parties mean that they shall confer and agree upon major decisions, including but not limited to such issues as * * * non-emergency medical care for the children."

Shortly thereafter, on November 29, father had his attorney send petitioner a letter directing her to stop treating the children and to have no further contact with them. A copy of the dissolution judgment was attached to the letter.

Petitioner read the letter, reviewed the judgment, and unsuccessfully tried to contact father or his attorney. The next day, she wrote a letter to father's attorney, asking him to tell father to call her if he had any concerns about the therapy. Father did not respond. Meanwhile, she tried to discern her ethical obligation by reviewing various codes and articles and by consulting with trusted advisors. One, a psychologist from Washington, told her she would violate the ethical code by *stopping* treatment. Others told her that her ethical duty was to the children. She also tried to obtain an opinion from the Oregon Psychological Association, but an employee of that group told her that it would not provide ethical advice to her because she was not a member. She did not consult with any psychologist currently practicing in Oregon.

Sometime in December, mother's attorney told her that petitioner could lawfully continue therapy, and mother relayed that information to petitioner. Petitioner later contacted mother's attorney and her own attorney to confirm that opinion. In reliance on all of the information and advice she had collected, she continued to hold therapy sessions with the children. Father then filed a complaint with the board, and the board, on March 19, 2001, sent petitioner a "Notice of Proposed Disciplinary Action" alleging that she had violated Rule 4.02(b) regarding informed consent. She then stopped treatment. Between her receipt of the letter from father's attorney directing her to stop therapy and her ultimate decision to do so, she had nine therapy sessions with the children.

In response to the "Notice of Proposed Disciplinary Action," petitioner requested a contested case hearing. In addition to petitioner and mother, only two witnesses testified at the hearing: Dr. Dragovich, an Oregon psychologist

and expert on psychologists' ethics, who reviewed the case on behalf of the board; and Dr. Davis, also an expert and an Oregon psychologist, former member (and chair) of the board, who testified on behalf of petitioner. Each offered an interpretation of Rule 4.02(b). The board adopted Dragovich's opinion and rejected Davis's, finding that Rule 4.02(b) "as further articulated by Dr. Dragovich" imposed the following standards, which it found were "readily ascertainable" by petitioner:

> "The standard of practice in obtaining the informed consent for minors 14 years of age or younger is that the parent * * * may reject or consent. If a parent rejects treatment, the psychologist must stop treatment even though the treatment is needed. The psychologist must attempt to mitigate any damage to the child.
>
> "In cases where the parents are separated, the standard of practice is to look at who has the right to obtain the service. Post-divorce, the psychologist must determine who has legal custody. If there is a disagreement between the parents who have joint custody in a divorce situation, there is no presumption that one parent can act for the other parent, unless it is an emergency. The psychologist must seek consent from both parents. Once informed that one parent rejects therapy, the psychologist must pause and try to bring the parents together to resolve the conflict. If a psychologist continues to treat without both parents' informed consent, it puts the child in a clinically impossible situation and creates the potential for harm. The psychologist should instead discontinue therapy and conduct one or two termination or referral session[s] with the child. If the psychologist thinks that the child is in imminent danger, the psychologist may seek a court order to continue treatment."

(Internal citations to administrative record omitted.) Based on petitioner's failure to follow this "further articulation" of Rule 4.02(b), the board concluded:

> "[Petitioner] violated Ethical Principle 4.02 * * * when she continued to provide therapy to two minor children after the father, who had joint custody and had the right of consent to non-emergency medical care under the divorce decree, specifically directed [petitioner] to cease therapy."

For this violation, the board reprimanded petitioner and imposed a civil penalty of $1,000. Petitioner seeks judicial review.

■    The parties agree that P and C are minor children and therefore incapable of giving informed consent themselves; that, when mother gave informed permission before the divorce, she was legally authorized to do so; and that petitioner provided nonemergency medical services to the children after father told her to stop. The major issue on which the parties disagree is whether the agency's interpretation of Rule 4.02(b) is, as the state contends, a plausible application of a preexisting general standard and hence lawfully applicable against petitioner, *see Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994) (deferring to agency's plausible interpretation of its own rules), or, as petitioner contends, a previously unarticulated rule that cannot lawfully be applied against petitioner because it did not give her adequate notice of the conduct that it proscribed, *see Megdal v. Board of Dental Examiners*, 288 Or 293, 320-21, 605 P2d 273 (1980) (defendant board cannot impose discipline without first adopting rules providing adequate notice).

    The Board of Psychologist Examiners could meet its *constitutional* obligation to provide due process without promulgating rules before enforcing professional norms in a contested case. *Id.* at 303. However, the board has a *legislatively imposed* obligation to promulgate rules of conduct, ORS 675.110(12), and, having done so, its ability to impose sanctions for conduct that the rules themselves do not proscribe is beyond its authority. In requiring the board to promulgate a code of conduct, in other words, the legislature implicitly limited the board's authority to enforce professional standards outside of that code. Therefore, the standard that the board applied against petitioner is not valid if, as petitioner contends, it is a new rule and not an interpretation of the existing code.

■    The board argues that the standard is not a new rule added to the code but an interpretation of an existing rule. We agree. The board interpreted Rule 4.02(b) to mean that a

psychologist commits an ethical violation when (1) the psychologist is treating the child or children of divorced parents, (2) both parents have legal authority to reject or consent to treatment, (3) one of the parents rejects treatment, and (4) the psychologist continues to provide therapy other than "termination or referral sessions." Rule 4.02(b) itself, as opposed to the board's interpretation, requires informed consent from "a legally authorized person," but it does not deal explicitly with withdrawal of informed permission, divorce, termination sessions, or referral sessions. In other words, it does not specifically address the situation that the board believed to apply here and to which its standard here is directed. However, as this court has long recognized, a code of professional conduct need not be so detailed as to spell out every contingency; "[i]t would be impossible to determine by prior rulemaking what is and what is not inappropriate or unnecessary treatment in all possible cases." *Spray v. Bd. of Medical Examiners*, 50 Or App 311, 318, 624 P2d 125, *modified on recons*, 51 Or App 773, 627 P2d 25, *rev den*, 291 Or 117 (1981); *accord Board of Medical Examiners v. Mintz*, 233 Or 441, 447, 378 P2d 945 (1963). It is sufficient for an agency to promulgate "broad bases upon which decisions regarding * * * licenses will be made." *Sun Ray Dairy v. OLCC*, 16 Or App 63, 74, 517 P2d 289 (1973).

■    Further, the text of a rule does not stand in isolation; context matters, particularly other parts of the same regulatory scheme. The context of Rule 4.02(b) includes Rule 4.09, "Terminating the Professional Relationship," which provides, in part:

> "(c) Prior to termination for whatever reason, * * * the psychologist * * * provides appropriate pretermination counseling, suggests alternative service providers as appropriate, and takes other reasonable steps to facilitate transfer of responsibility to another provider if the patient or client needs one immediately."

This rule requires a psychologist who stops treatment to follow a course not unlike the one required by the board in the present case. Thus, the standard applied here deals with a particular subset of the situations that might arise under the general standard articulated in Rule 4.02, and it does so in a

way that is ascertainable from that rule's context. We there-fore conclude that requiring a therapist who is treating a minor child of divorced parents who have joint custody and mutual authority to withdraw consent, but who cannot agree on treatment, to "discontinue therapy and conduct one or two termination or referral session[s] with the child," is not a new rule but a plausible interpretation of Rule 4.02(b) in context, providing adequate notice of what is and is not required.

■ That conclusion, however, does not end the matter. Beginning with her response to the "Notice of Proposed Dis-ciplinary Action," petitioner has consistently argued that even if the board's standard in this case is a lawful interpre-tation of Rule 4.02(b), it nonetheless does not apply to the cir-cumstances of her case. We agree. As written and interpreted by the board, the rule prohibits a psychologist from continu-ing to provide therapy when permission for the therapy from "a legally authorized person" no longer exists. In the present case, the parties agree that when petitioner began therapy, she had permission from mother, and mother was legally authorized to give it. The foundation on which the board's discipline rests is father's decision to withdraw consent. According to the board, that withdrawal, in combination with the dissolution judgment requiring the parents to agree on major medical decisions, renders mother's unilateral decision to continue therapy invalid. But that reasoning supports the board's conclusion only if, under the dissolution judgment, father actually had the legal authority to withdraw consent. If he did not, then nothing altered the status quo at the time of the dissolution. Petitioner had informed permission from a person with lawful authority when therapy commenced, and if father had no authority to terminate the therapy, then mother's permission continued unabated.

Whether father had that authority depends on inter-pretation of the provision in the dissolution judgment that states, "the parties * * * shall confer and agree upon major decisions, including but not limited to such issues as * * * non-emergency medical care for the children." Again, accord-ing to the board, that provision means that the medical deci-sion to continue therapy has legal force only if mother and father consult and agree to the continuation. Because no such consultation or agreement occurred, the board reasoned,

mother's decision to continue therapy was unilateral and therefore legally inadequate; mother was no longer a person "legally authorized" under the dissolution judgment to make the medical decision to continue. Therefore, the board concluded, petitioner provided continuing therapy without adequate informed consent.

■ Because the board has neither expertise nor experience in construing legal documents such as dissolution judgments, its interpretation is entitled to no deference. We conclude that it is wrong as a matter of law. The judgment more logically means that the medical decision to *terminate* therapy had legal force only if *that* was a decision on which mother and father consulted and agreed. Because no such agreement occurred, *father's* decision to *end* therapy was unilateral and therefore legally ineffective; he was not a person "legally authorized" by the dissolution judgment to make that medical decision. Therefore, because no person with the power to do so ever withdrew mother's original valid informed permission, petitioner continued therapy with informed permission from a person legally authorized to give it.

Powerful arguments support this interpretation of the judgment. When the judgment was drafted, the status quo was that the children were in therapy; changing the status quo is typically more of a "decision" than letting it continue. If, for example, the treatment in question were not psychotherapy but chemotherapy, one would surely regard prematurely stopping the treatment contrary to the provider's advice as a "decision." If those were the circumstances, mother's argument that father had no unilateral authority under the judgment to order a halt to treatment would be logically compelling. We perceive no reason why, from a legal standpoint, the situation here differs.

Thus, the board erred by not adopting mother's interpretation of the dissolution judgment. When father attempted to terminate the children's therapy, unilaterally and contrary to petitioner's and mother's better judgment, he made a "decision" that he was not authorized to make. Consequently, no valid withdrawal or termination of informed

permission occurred. The board erred in concluding otherwise.[1]

Reversed and remanded for reconsideration.

**DEITS, C. J.**, concurring.

I agree with the majority that we must reverse the order of the Board of Psychologist Examiners (board). However, I disagree with the majority that, in concluding that the conduct in this case was prohibited, the board relied on a plausible interpretation of Ethical Principle 4.02.[1] In my view, Ethical Principle 4.02 did not put petitioner on notice that her conduct was prohibited and, accordingly, the board in effect applied to petitioner an unannounced standard of conduct. I would reverse the board's order on that ground and remand for reconsideration.

As noted by the majority, the legislature has authorized the board to formulate a code of professional conduct for psychologists. ORS 675.110(12). Pursuant to ORS 675.110(12) and (15), which give the board rulemaking authority, the board promulgated OAR 858-010-0075(1), adopting the American Psychological Association's Ethical Principles of Psychologists and Code of Conduct as the code of professional conduct for psychologists in Oregon. To the extent that the board's interpretations of that code are plausible and not inconsistent with other sources of law, we will defer to the board's interpretations. *See, e.g., Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994). To be entitled to deference, however, those interpretations must be plausible. *See id.* In a related vein, and as the majority acknowledges, 193 Or App at 720-21, the board may not impose sanctions for conduct that the code does not proscribe. *See Cochran v. Board of Psychologist Examiners (A105672)*, 171 Or App 311, 320-21, 15 P3d 73 (2000) (Edmonds, J., concurring) ("[B]y granting authority to

---

[1] In light of this conclusion, we do not reach petitioner's remaining assignments of error.

[1] The majority refers to the precepts in the Code of Conduct as "Rules," but I follow the practice of the board and the parties and refer to them as "Ethical Principles."

the Board to impose sanctions for ethical violations, the legislature intends that practitioners be on notice about what conduct the board's code of ethics requires before sanctions are imposed[.]"). Put simply, the board lacks authority to impose discipline based on an implausible interpretation of the code, because practitioners can be deemed to be on notice only of interpretations that are plausible.

A plausible interpretation of a rule is one that is "consistent with the wording of that rule, considered in its context." *Don't Waste Oregon Com.*, 320 Or at 142. In my view, considering the wording of Ethical Principle 4.02 in its context, the board's interpretation was implausible.

Ethical Principle 4.02, in its entirety, provides:

**"4.02 Informed Consent to Therapy**

"(a) Psychologists obtain appropriate informed consent to therapy or related procedures, using language that is reasonably understandable to participants. The content of informed consent will vary depending on many circumstances; however, informed consent generally implies that the person (1) has the capacity to consent, (2) has been informed of significant information concerning the procedure, (3) has freely and without undue influence expressed consent, and (4) consent has been appropriately documented.

"(b) When persons are legally incapable of giving informed consent, psychologists obtain informed permission from a legally authorized person, if such substitute consent is permitted by law.

"(c) In addition, psychologists (1) inform those persons who are legally incapable of giving informed consent about the proposed interventions in a manner commensurate with the persons' psychological capacities, (2) seek their assent to those interventions, and (3) consider such persons' preferences and best interests."

Ethical Principle 4.02, by its terms, refers only to issues surrounding obtaining informed consent at the initiation of treatment. It does not address issues of continuing consent during ongoing treatment; withdrawal of consent on behalf of a person without capacity to consent; or how to resolve issues that might arise when two parents who have joint custody

differ about the propriety of treatment. In my view, it is not plausible to interpret Ethical Principle 4.02 as applying to subjects that it does not address.

The majority acknowledges that Ethical Principle 4.02 itself does not address the issues at hand. 193 Or App at 721. The majority nonetheless concludes that the board's interpretation of Ethical Principle 4.02 was plausible. I disagree with both of the points that the majority relies upon to reach that conclusion.

First, the majority observes that agencies are not required to spell out every possible situation to which rules will apply; instead, agencies may promulgate broad bases under which particular conduct will be assessed. *Id.* To the extent that that observation is correct, it does not apply here.[2] Ethical Principle 4.02 is not a broad rule of conduct under which the board may assess whether particular conduct falls within it. Rather, it is a highly specific rule that addresses a particular topic: obtaining informed consent at the initiation of treatment. There is an important analytical difference, in my view, between broad rules that may be interpreted as applying to a variety of conduct, and particularized rules that clearly apply only to the conduct they mention.

An examination of the cases that the majority relies on supports my position. In *Board of Medical Examiners v. Mintz*, 233 Or 441, 444, 378 P2d 945 (1963), the Board of Medical Examiners found that the petitioner had represented to two patients that he would perform abortions on

---

[2] The majority relies on three cases to support the assertion that codes of professional conduct need not be so detailed as to spell out every contingency. Insofar as the majority relies on *Spray v. Bd. of Medical Examiners*, 50 Or App 311, 624 P2d 125, *modified on recons*, 51 Or App 773, 627 P2d 25, *rev den*, 291 Or 117 (1981), the holding of that case is limited to those professional ethical principles that incorporate the violation of generally accepted standards of treatment as a basis for sanction. *Board of Medical Examiners v. Mintz*, 233 Or 441, 378 P2d 945 (1963), predates *Megdal v. Board of Dental Examiners*, 288 Or 293, 605 P2d 273 (1980), and the approach taken in *Mintz*—ascertainment of ethical standards on a case-by-case basis through expert testimony in contested cases—was disavowed in *Megdal*. *Megdal*, 288 Or at 305-07. Finally, *Sun Ray Dairy v. OLCC*, 16 Or App 63, 517 P2d 289 (1973), concerned standards for granting or denying a liquor license, not ethical standards related to a professional license, and so its analysis is inapposite. In my view, under *Megdal*, the board must, with reasonable specificity, outline what conduct is sanctionable in advance of imposing discipline.

them and provided them drugs for that purpose. The board concluded that the petitioner's conduct violated what is now ORS 677.190(1)(a), which allows the board to revoke or suspend licenses in cases of "[u]nprofessional or dishonorable conduct." The Supreme Court rejected the trial court's conclusion that ORS 677.190(1) was "inoperative" because the board had not adopted rules defining the broad term "unprofessional or dishonorable conduct." *Mintz*, 233 Or at 446. The court noted that "the variety of forms which unprofessional conduct may take makes it infeasible to attempt to specify in a statute or regulation all of the acts which come within the meaning of the term." *Id.* at 448. The court suggested that the standards of "unprofessional or dishonorable conduct" were not so indefinite as to be unascertainable, because licensees could determine the contours of the standards by referring to the standards generally accepted by other practitioners; for disciplinary purposes, the standards can be established through expert testimony. *Id.* at 448-49. *Mintz* is an example of a case where regulatory wording, by virtue of its breadth, could reasonably form the basis for discipline based on a range of unspecified conduct.

In *Sun Ray Dairy v. OLCC*, 16 Or App 63, 73, 517 P2d 289 (1973), we held that, in the absence of rules that implemented a statute governing OLCC's authority to deny licenses, the court was unable to ascertain the standards against which an application for a liquor license was to be measured. That case illustrates wording that was so broad as to be standardless. As the majority notes, the *Sun Ray Dairy* court observed that it is sufficient for agencies to promulgate "broad bases upon which decisions regarding issuance of liquor licenses will be made." *Id.* at 74. That observation pertains to *broad* bases, however, and says nothing that would justify reading one relatively narrow basis for a licensing decision as applicable to a type of conduct not within its purview.

Finally, in *Spray v. Bd. of Medical Examiners*, 50 Or App 311, 317-19, 624 P2d 125, *modified on recons*, 51 Or App 773, 627 P2d 25, *rev den*, 291 Or 117 (1981), we indicated that a specific broad category of misconduct—unacceptable medical treatment—could be made generally unethical, with particular instances of that kind of misconduct assessed against

generally accepted practices as ascertained by expert testimony in particular contested cases. Again, however, *Spray* involved a broad category of misconduct that need not be exhaustively defined in advance; it did not allow expansive interpretation of a narrower category in order to capture unspecified conduct as a basis for sanction. In sum, nothing in the cases cited by the majority supports interpreting Ethical Principle 4.02 more broadly than its terms provide.

The second problem with the majority's reading of the rule is its reliance on context to inform its interpretation of Ethical Principle 4.02. I do not dispute that it is appropriate to look to other parts of the same regulatory code when trying to determine whether an agency's construction of its rule is plausible. *See, e.g., Don't Waste Oregon Com.*, 320 Or at 142. What I dispute is that Ethical Principle 4.09 changes the plain meaning of Ethical Principle 4.02. Ethical Principle 4.09 provides, in part:

> "(c) Prior to termination for whatever reason, * * * the psychologist * * * provides appropriate pretermination counseling, suggests alternative service providers as appropriate, and takes other reasonable steps to facilitate transfer of responsibility to another provider if the patient or client needs one immediately."

The topic of Ethical Principle 4.09 is plain: the proper procedures that a psychologist must follow after a decision to terminate service has been made. Ethical Principle 4.09 is silent, however, about *how* the decision to terminate is to be made. Moreover, Ethical Principle 4.09 addresses none of the factors that the board announced in its "interpretation" of Ethical Principle 4.02: divorced parents, joint custody, or the right to reject treatment. Although reading Ethical Principle 4.09 could provide a psychologist with an ethical way to terminate therapy that has been initiated using the informed consent procedures outlined in Ethical Principle 4.02, it does nothing to inform a psychologist about the circumstances under which termination of service is required. In fact, by its terms, Ethical Principle 4.09 applies to termination of service "for whatever reason." I disagree with the majority that Ethical Principle 4.09 provides context to support the board's reading of Ethical Principle 4.02.

In my view, the board in this case did not plausibly interpret Ethical Principle 4.02, the only existing rule that petitioner was charged with violating. Instead, it announced a new rule and applied it to petitioner. Because the board's interpretation of its rule was implausible, I would reverse the board's order in this case.

For the reasons stated above, I concur.